**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 5 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

MARSHA K. HARDEMAN,

       Plaintiff-Appellee/Cross-
       Appellant,

    v.

CITY OF ALBUQUERQUE; JIM
BACA, Mayor; and THERESA
TRUJEQUE, in their individual and
official capacities,

       Defendants-Appellants/Cross-
       Appellees.

Nos. 03-2001 and 03-2017

_____

**APPEALS FROM THE UNITED STATES DISTRICT**
**COURT FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CIV-01-937-BRB/DJS)**

_____

Eric Sirotkin, Legal Counseling Services, Albuquerque, New Mexico, for
Plaintiff-Appellee/Cross-Appellant.

M. Karen Kilgore, White, Koch, Kelly & McCarthy, P.A., Santa Fe, New Mexico,
for Defendants-Appellants/Cross-Appellees.

_____

Before **HENRY, HOLLOWAY**, and **O'BRIEN,** Circuit Judges.

_____

**HENRY,** Circuit Judge.

_____

Marsha Hardeman filed this action against the City of Albuquerque; the former Mayor, Jim Baca; and her former supervisor, city employee Theresa Trujeque, alleging violations of her First and Fourteenth Amendment rights and seeking damages under 42 U.S.C. §§ 1981 and 1983. Specifically, Ms. Hardeman alleged 1) that she was terminated from her employment as a Department Director of the Albuquerque Convention Center because of her race and/or because she exercised her First Amendment free speech rights; 2) that she was subjected to disparaging public comments and/or denied a post-termination contract in retaliation for her association with African-American groups; and 3) that her due process liberty interests were violated.

The district court dismissed Ms. Hardeman's liberty interest claim on defendants' motion for judgment as a matter of law; all other claims were submitted to a jury. The jury found in favor of Ms. Hardeman on the remaining claims, except the claim that she was discharged because of her race. Following the trial, the defendants filed a Motion for Judgment as a Matter of Law pursuant to Rule 50(b) and a Motion for a New Trial, Remittitur, and to Alter or Amend the Judgment pursuant to Rule 59. The court denied the Rule 50(b) motion, denied in part and granted in part the Rule 59 Motion, and entered an amended judgment reducing the punitive damages against the Mayor on two of the verdicts. The defendants now appeal, and we affirm.

# I. BACKGROUND

As of December 1, 1997, plaintiff Marsha Hardeman, who is African-American, was appointed to the position of Department Director of the Albuquerque Convention Center by the newly elected Mayor Jim Baca. She was a cabinet-level, exempt employee who served at the pleasure of the Mayor.

Beginning in the spring of 1998, Ms. Hardeman was involved in three incidents that led her to criticize or question the actions of the Baca Administration and her supervisor, Theresa Trujeque. Ms. Hardeman claims that her criticism of the administration and of fellow city employees led to her discharge, that her expression of opinion on these matters constituted protected speech, and that the defendants violated her First Amendment rights by discharging her as a result of her speech. In addition to her discharge claim, Ms. Hardeman claims that she was later subjected to disparaging public comments and denied a post-termination contract that was promised to her because of her perceived association with African-American groups.

The first speech-related incident leading to Ms. Hardeman's discharge began when the Convention Center's contracts with Ms. Hardeman's church were selected for auditing. Ms. Hardeman questioned the decision to audit the contracts in a May 14, 1998, e-mail to Debra Yoshimuro, the Director of the

-3-

Office of Internal Audit. Her e-mail asked: "What is going on? Am I suspected of some kind of unethical conduct. [sic] Someone had to have specifically alerted your staff–otherwise, why [is] MY church, of all the local groups we work with on a repeat customer basis, under scrutiny?" Aplts' App. vol. I, at 267. Ms. Hardeman subsequently drafted a memo to Ms. Yoshimuro expressing concern that the methods of identifying clients for the audit could "create the appearance of de facto discrimination," and that by "only Black clients [being] targeted by the auditors . . . [it] can discourage or thwart efforts to cultivate business within a minority segment of the community." *Id.* at 219. Ms. Hardeman also expressed her frustration over the audit in an August 16, 1998, e-mail to the City's Chief Administrative Officer, Lawrence Rael. *Id.* at 224.

The second incident stemmed from the disciplining of Convention Center employee Doug Reed. Defendant Theresa Trujeque allegedly disciplined Mr. Reed by yelling at him and pointing her finger in his face. She later reported Mr. Reed to Ms. Hardeman, who was Mr. Reed's supervisor at the time, and told Ms. Hardeman that she wanted Mr. Reed to be fired. Ms. Hardeman sent Mr. Reed home for several days without pay, but she did not fire him or discipline him further. Ms. Hardeman testified that her investigation of the matter revealed that Ms. Trujeque had pointed her finger at Mr. Reed and yelled, "You people. I'm sick and tired of you people thinking you are in charge of something," Aplts'

-4-

App. vol. II, at 676, and that she believed that Ms. Trujeque's actions toward Mr. Reed, who is African-American, were racially motivated.

According to Ms. Hardeman's testimony, Mr. Reed "specifically responded to [Ms. Trujeque's action] as though it was an affront to him as a black man." *Id.* The incident left Ms. Hardeman "concerned about another case now where [her] boss, a high ranking city official, had acted inappropriately . . . with an employee, a black person." *Id.* She criticized Ms. Trujeque's handling of the incident in an e-mail to Ms. Trujeque which she also forwarded to Mr. Rael. The e-mail asserted that Ms. Trujeque's alleged finger-pointing would be "considered by many legalists to be 'provoking behavior.'" Aplts' App. vol. I, at 220.

The final speech-related incident leading up to Ms. Hardeman's termination concerned an alleged attempt by Ms. Trujeque to threaten a city vendor, the general manager of "Fine Host" catering. The catering manager, Mr. Thorson, had witnessed the incident between Ms. Trujeque and Mr. Reed. Ms. Trujeque wrote to Ms. Hardeman saying that she "hope[d] Martin [Thorson] from Fine Host is not involving himself in this issue since I understand from Special Events Staff that he interfered where he shouldn't have and caused alot [sic] of this [sic] problems." *Id.* at 223. Ms. Hardeman interpreted Ms. Trujeque's statement as an apparent threat to Mr. Thorson, whose catering company was involved in the contract renewal process at the time. Consequently, Ms. Hardeman reported Ms.

-5-

Trujeque's conduct to Mr. Rael, expressing her concern that the apparent threat could reflect negatively on the fairness of the contract renewal process. She sent Mr. Rael an e-mail saying, "if Theresa appears to be threatening the caterer's General Manager too-----eeeee!" Aplts' App. vol. I, at 224.

Following these three incidents, all of which took place between May and August of 1998, Mayor Baca directed Mr. Rael to ask for Ms. Hardeman's resignation. She resigned as of September 4, 1998. The Mayor instructed Mr. Rael to offer Ms. Hardeman a post-termination contract, the terms of which Mr. Rael negotiated with Ms. Hardeman, for approximately $40,000, under which she would provide training to city employees for a five- to seven-month period to facilitate her transition out of city government. After Mr. Rael made the initial proposal of a contract, the onus apparently was on Ms. Hardeman to draft a contract and present it to Mr. Rael. Ms. Hardeman testified that she drafted a proposed contract and sent it to Mr. Rael, through his secretary, for his signature. Aplts' App. vol. II, at 687-89. Mr. Rael testified that he did not recall receiving an inquiry from Ms. Hardeman about the contract, *id.* at 518, and he never signed the document.

Ms. Hardeman's discharge elicited a strong response from members of the local African-American community. Shortly after she was forced to resign, an NAACP official and several African-American ministers wrote letters to the

Mayor and the press suggesting that Mayor Baca had effectively alienated the African-American community and made them feel unwelcome. *See, e.g.*, Aplts' App. vol. I, at 237 (Letter from the New Mexico Chapter of the NAACP, dated Oct. 5, 1998) ("It is a sad commentary to note that in just the past few weeks, our State's largest, most diverse city, has systematically erased the visible presence of its Black constituents."). Additionally, a group of African-American ministers and others held a press conference expressing their outrage over Ms. Hardeman's discharge and questioning the Mayor's commitment to diversity.

Mayor Baca testified that he "became a little bit upset" when he saw the news conference, Aplts' App. vol. III, at 1079, as he believed that the participants in the conference were accusing him of being a racist. He also believed that he saw Ms. Hardeman standing in the background at the press conference, though he "later acknowledged that the woman he saw at the conference only had a black face and looked like [Ms. Hardeman.]." Aplts' App. vol. I, at 187 (Dist. Ct. Order Denying Rule 50 Motion, filed Nov. 25, 2002). Ms. Hardeman "testified she never encouraged anyone to object to her discharge and was not involved in the letter writing campaign or press conference." *Id.* Following the controversial press conference, Mayor Baca called Ms. Hardeman at her home and left a message stating:

> Hi, Marsha. This is Jim Baca. I'm really disappointed [in] what you've done. I think you owe me an apology. I think it's just tragic that

you've stooped to this. Good-bye.

Aplts' App. vol. II, at 701. Ms. Hardeman also alleges that Mayor Baca "began a campaign of false and disparaging public statements to the news media against [her]." Aple's Br. at 5. She contends that the campaign was still going on four years later, when the trial began.

Ms. Hardeman filed a federal action under 42 U.S.C. §§ 1981 and 1983 against the City of Albuquerque, Mayor Baca, and Ms. Trujeque, alleging violations of her First Amendment rights to free speech and free association and her Fourteenth Amendment right to be free from racial discrimination. A jury found in favor of Ms. Hardeman on all claims except the claim that she was discharged because of her race. The jury found the following:

> 1) On Special Verdict Form (SVF) 1A, the jury determined that Ms. Hardeman's protected speech was a motivating factor in the Mayor's decision to discharge her. The jury awarded back pay of $236,432; front pay of $352,746; damages for mental anguish in the amount of $100,000; and punitive damages against Mayor Baca in the amount of $250,000.
>
> 2) On SVF 1B, the jury determined that Ms. Trujeque performed acts leading to Ms. Hardeman's discharge and awarded back pay of $118,216; front pay of $176,373; damages for mental anguish in the amount of $100,000; and punitive damages against Ms. Trujeque in the amount of $1 million.
>
> 3) On SVF 3, the jury determined that Mayor Baca intentionally discriminated against Ms. Hardeman based on her race when he deprived her of a post-termination contract and awarded compensatory damages of $31,225 and punitive damages against the Mayor in the amount of $1 million.

4) On SVF 4, the jury determined that Mayor Baca made disparaging public comments and/or deprived Ms. Hardeman of a post-termination contract because of her association with African-American groups and awarded compensatory damages in the amount of $31,225 and punitive damages against the Mayor in the amount of $1 million.

Subsequent to the trial, the defendants filed a Motion for Judgment as a Matter of Law pursuant to Rule 50(b) and a Motion for a New Trial, Remittitur, and to Alter or Amend the Judgment pursuant to Rule 59. The court denied the Rule 50(b) motion and denied in part and granted in part the Rule 59 Motion. The court entered an amended judgment reducing the punitive damages against the Mayor in SVF 3 and SVF 4 from $1 million each to $625,000 each. The defendants argue on appeal that the district court erred in submitting each of the four verdict forms to the jury and that the district court erred in submitting the issue of punitive damages to the jury.

## II. DISCUSSION

Most of the questions raised in this appeal, including all of the defendants' sufficiency of the evidence claims, concern the district court's denial of the defendants' Rule 50(b) motion for judgment as a matter of law (JMOL). "We review the district court's denial of a Rule 50(b) motion for judgment as a matter of law *de novo*, applying the same legal standard as the district court." *Veile v. Martinson*, 258 F.3d 1180, 1188 (10th Cir. 2001). "In reviewing the district

court's refusal to grant JMOL, this court draw[s] all reasonable inferences in favor of the nonmoving party. . . . The district court's refusal to grant JMOL will only be reversed if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1279 (10th Cir. 2003) (internal citations, alterations, and quotation marks omitted). The defendants' claims concerning the wording of SVF 4 and the alleged excessiveness of the punitive damages awards merit a slightly different standard of review, as discussed in parts C and D below.

We now examine each of the verdicts in turn to determine whether submission to the jury was proper. We then direct our attention to the issue of punitive damages.

## A. Submission of SVF 1A and 1B to the Jury

SVF 1A and SVF 1B concern Ms. Hardeman's claim that she was discharged from her position as Department Director of the Albuquerque Convention Center in violation of her First Amendment rights. In SVF 1A, the jury determined that Ms. Hardeman's protected speech was a motivating factor in the Mayor's decision to discharge her and awarded compensatory damages against the Mayor and the City and punitive damages against the Mayor. In SVF 1B, the jury determined that Ms. Trujeque performed acts leading to Ms. Hardeman's

discharge and awarded compensatory and punitive damages against Ms. Trujeque. The defendants argue that the district court erred in submitting SVF 1A and SVF 1B to the jury because 1) Ms. Hardeman's speech did not involve a matter of public concern; 2) there was insufficient evidence to support the finding that Ms. Hardeman was fired as a result of her speech; and 3) there was insufficient evidence to support the award of front pay in SVF 1A and SVF 1B.[1]

### 1. Matter of Public Concern

The defendants argue that the district court erred in submitting Ms. Hardeman's free speech claims to the jury because her speech did not address a matter of public concern. *See Belcher v. City of McAlester*, 324 F.3d 1203, 1207 (10th Cir. 2003) (noting that *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968),

---

[1] The defendants never argued that Ms. Hardeman's termination was a political patronage dismissal of an individual in a policymaking position. *See Rutan v. Republican Party*, 497 U.S. 62, 70 (1990) (interpreting *Elrod v. Burns*, 427 U.S. 347 (1976), as holding that "a government can meet its needs for politically loyal employees to implement its policies by the less intrusive means of dismissing, on political grounds, only those employees in policymaking positions"); *see also Elrod*, 427 U.S. at 367 (recognizing "the need for political loyalty of employees," but holding that "limiting patronage dismissals to policymaking positions is sufficient to achieve those ends"). They also declined to argue that the administration's interest in governmental efficiency and avoiding disruption outweighed Ms. Hardeman's interest in making the speech. *See Pickering v. Board of Educ.,* 391 U.S. 563, 568 (1968) (requiring courts to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees").

requires courts to consider whether a plaintiff's speech "touches on a matter of public concern"). They contend that Ms. Hardeman was "motivated by her desire to defend her own conduct, . . . not to disclose malfeasance," Aplts' Br. at 28, and that her speech merely reflected her "dislike of what she viewed as Ms. Trujeque's rude and confrontational management style." *Id.* at 28-29. The defendants seek to classify all of Ms. Hardeman's speech as related to an interpersonal dispute between Ms. Hardeman and Ms. Trujeque.

"In determining whether the speech touches on a matter of public concern, we look to whether it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Burns v. Bd. of County Comm'rs*, 330 F.3d 1275, 1286 (10th Cir. 2003) (internal quotation marks omitted). "Although speech related to internal personnel disputes ordinarily does not involve public concern, speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials . . . clearly concerns matters of public import." *Dill v. City of Edmond*, 155 F.3d 1193, 1202 (10th Cir. 1998) (internal quotation marks omitted). The Supreme Court has held that "'racial discrimination,' at least in the context of public-employment, is 'a matter inherently of public concern.'" *Quigley v. Rosenthal*, 327 F.3d 1044, 1060 (10th Cir. 2003) (quoting *Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983)).

Some of Ms. Hardeman's speech may have related to her personal dispute

-12-

with Ms. Trujeque. Much of her speech, however, did claim to be "evidence of corruption, impropriety, or other malfeasance on the part of city officials." *Dill*, 155 F.3d at 1202 (quoting *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988)). We agree with the district court that Ms. Hardeman's comments "pointed out the possible ramifications of what appeared to be racially-motivated discriminatory conduct," "related to the City's obligation to provide due process to city employees," and "manifested concern over the fairness of the City's bidding process for potential caterers." Aplts' App. vol. I, at 177-78. We therefore hold that Ms. Hardeman's speech involved a matter of public concern.

## 2. Sufficiency of the Evidence

The defendants argue that even if Ms. Hardeman's speech was a matter of public concern, there is insufficient evidence to support Ms. Hardeman's claim that she was discharged in retaliation for her protected speech. They assert that Ms. Hardeman's discharge could not have been the result of her speech because the Mayor, who was responsible for Ms. Hardeman's firing, had no knowledge of Ms. Hardeman's speech; and because Ms. Trujeque, who clearly did have the requisite knowledge, had no involvement with the firing. The former claim challenges the sufficiency of the evidence with respect to SVF 1A, and the latter claim challenges the sufficiency of the evidence with respect to SVF 1B.

Defendants first argue that there was insufficient evidence to support SVF

1A, the verdict against the Mayor, because he was not aware of Ms. Hardeman's speech and therefore could not have fired her because of it. The defendants suggest that Ms. Hardeman was actually discharged due to "problems with the convention center's cleanliness (especially the restrooms), sound system, and escalators." *Id.* at 178.

Ms. Hardeman asserts that "there is both direct and circumstantial evidence of [Mayor Baca's] knowledge of [her] concerns." Aple's Br. at 44. Most notably, she relies on the testimony of Mr. Rael, who testified that he discussed the auditing controversy with the Mayor and that "[t]he rumor mill is very active," Aplts' App. vol. II, at 457, and acknowledged that the incident involving Mr. Reed was "sort of the talk of the mayor's office." *Id.* at 462. Ms. Hardeman also points to circumstantial evidence of knowledge and causation, including the evidence that Mr. Rael and the Mayor talked about these sorts of issues on an almost daily basis and the suspicious timing of Ms. Hardeman's discharge. Furthermore, she notes that she was not made aware of the alleged problems or concerns with the convention center's cleanliness prior to her dismissal and that several city employees testified that "the conditions of the center under [Ms. Hardeman] were exemplary." *Id.* vol. I, at 178-79.

Next, the defendants argue that there was insufficient evidence to support SVF 1B, the verdict against Ms. Trujeque, because Ms. Trujeque was not

involved in Ms. Hardeman's discharge. The defendants assert that

> even if Defendant Trujeque was generally confrontational, rude and hostile to City employees, that conduct does not reveal that Defendant Trujeque had any wishes that Mayor Baca ask for Plaintiff's resignation much less that Defendant Trujeque performed acts, motivated by Plaintiff's First Amendment speech, that caused Plaintiff's termination.

Aplts' Br. at 34 (internal quotation marks omitted). Ms. Trujeque testified that she did not complain to the Mayor about Ms. Hardeman and that she did not "influence his decision one way or the other about Ms. Hardeman's resignation." Aplts' App. vol. IV, at 1574. Mayor Baca testified that he did not consult with Ms. Trujeque prior to deciding to ask Ms. Hardeman to resign. *Id.* at 1636.

Ms. Hardeman cites Mr. Rael's testimony and circumstantial evidence of Ms. Trujeque's influence as support for SVF 1B. Mr. Rael testified that he "may have surmised that [the conflict with Ms. Trujeque] may have been part of" the reason for Ms. Hardeman's termination. Aplts' App. vol. II, at 476. He also testified that the Mayor knew Ms. Trujeque very well and "had a great deal of confidence in [her]," *id.* at 433, and that he sometimes felt left out of the loop of discussions between the Mayor and Ms. Trujeque. *Id.* at 433-35. Others testified to Ms. Trujeque's power and influence in the administration, with one witness explaining that "[h]er presentation was that she spoke for the mayor," and that she gave the impression that she was his "right-hand." Aplts' App. vol. III, at 1163-64. Testimony also suggested that Ms. Trujeque disliked those who disagreed

-15-

with her and displayed an "off with their heads" attitude toward firing employees. *Id.* at 986.

Ms. Hardeman has presented some evidence to suggest that the Mayor was aware of her speech and that Ms. Trujeque was involved in the events leading up to her discharge. It is true that there is not a great deal of direct evidence tying Ms. Hardeman's discharge to her speech. A lack of direct evidence is not, however, uncommon in retaliation cases like this one. *See Smith v. Maschner*, 899 F.2d 940, 949 (10th Cir. 1990) ("Precisely because the ultimate fact of retaliation turns on defendants' state of mind, it is particularly difficult to establish by direct evidence."). The defendants have advanced a pure motive for Ms. Hardeman's discharge–that the Convention Center was not kept clean enough; however, as the district court pointed out, "a jury is entitled to reject an employer's explanation for a given action and, if supported by the evidence, may reasonably 'infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.'" Aplts' App. vol. I, at 181 (citing *Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1241 (10th Cir. 2002)). The testimony of Mr. Rael, circumstantial evidence of Ms. Trujeque's influence over the Mayor, the fact that Ms. Hardeman was discharged within a month of making the protected speech, and the lack of evidentiary support for the defendants' proffered reason for Ms. Hardeman's discharge all weigh in Ms.

Hardeman's favor. Taken in full and viewed in the light most favorable to Ms. Hardeman, this evidence is sufficient to support the jury's verdicts on SVF 1A and SVF 1B.

### 3. Award of Front Pay

The jury awarded Ms. Hardeman a total of $529,119 in front pay on SVF 1A and SVF 1B. This award was based on "salary and benefits and pension to be earned by Plaintiff through the Chavez Administration in December 2005."[2] Aplts' App. vol. I, at 182. Mayor Chavez testified that "[Ms. Hardeman] would not have been retained in my administration." Aplts' App. vol. IV, at 1481. He also testified that when he began his term in December 2001, he carried out "the biggest house-cleaning, in my memory, of directors," and "let everybody but the City Attorney go, some people who I admire and respect very much." *Id.* at 1480.

The defendants argue that there was no support for the award of front pay on SVF 1A and 1B because "there was no legally sufficient evidence presented to contradict the testimony of Mayor Martin Chavez that he would <u>not</u> have retained Plaintiff." Aplts' Br. at 37. Ms. Hardeman asserts that Mayor Chavez's testimony was biased in favor of the city and was motivated by a desire to protect the city and Mayor Baca. She notes that she served as the co-chair of Mayor

---

[2] Mayor Martin Chavez succeeded Mayor Baca in December 2001. He served a previous term as mayor in the early 1990s.

-17-

Chavez's transition team during his first term as mayor in 1993 and was praised for her performance in that role. Furthermore, Ms. Hardeman points out that Mayor Chavez "did retain people who were in his prior administration. . . . The 'housecleaning' addressed people who were not under his [prior] administration, but had been under the Baca administration exclusively." Aple's Br. at 49.

This issue essentially turns on the jury's evaluation of Mayor Chavez's testimony that he would not have retained Ms. Hardeman. As the district court acknowledged, "[t]he jury was free to discredit Mayor Chavez' testimony as biased in favor of Defendant City of Albuquerque which will pay Plaintiff's compensatory damages." Aplts' App. vol. I, at 182. In reviewing a district court's denial of a motion for JMOL, "this court does not weigh the evidence, pass on the credibility of the witnesses, or substitute [its] conclusions for that of the jury." *Minshall*, 323 F.3d at 1279. Viewing the evidence in the light most favorable to Ms. Hardeman, the non-moving party, "the jury reasonably could conclude [that] absent the Baca administration's wrongdoing, Mayor Chavez would have retained Plaintiff in his second administration." Aplts' App. vol. I, at 183.

**B. Submission of SVF3 to the Jury**

SVF3 asked the jury to determine whether "Defendants City of Albuquerque and Mayor Baca discriminated against Plaintiff on the basis of race

in denying her a post-termination contract with the City." Aplts' App. vol. I, at 173. The defendants advance three main arguments with respect to SVF 3: 1) that this claim was never pled in the district court; 2) that there was insufficient evidence to support the claim; and 3) that SVF 3 and SVF 4 were duplicative, resulting in double recovery.

### 1. Pleadings in the District Court

The defendants argue that at trial, Ms. Hardeman advanced her race discrimination claim solely as a pre-termination claim, not as a post-termination claim. Ms. Hardeman responds she did plead post-termination race discrimination in Count II of her complaint. She also notes that the parties stipulated to a jury instruction stating that she could establish liability under 42 U.S.C. §1981 by proving that race was a "motivating factor in defendants' decision to force the resignation of plaintiff Hardeman *or to deny her a post resignation contract*," Aplts' App. vol. I, at 53 (emphasis added).

Count II of Ms. Hardeman's complaint alleges race discrimination and explicitly "incorporates the preceding paragraphs as if the same were contained herein." Aples' Supl. App. at 33 (Complaint ¶ 71). Paragraph 48 of the complaint, which precedes Count II, references the withdrawal of the post-termination contract that Ms. Hardeman was offered subsequent to her termination. Based on this language, we agree with the district court's finding

that Ms. Hardeman did plead post-termination race discrimination below. *See* Aplts' App. vol. V, at 1745-46.

## 2. Sufficiency of the Evidence

Next, the defendants argue that there is no evidence to support SVF 3, as there is nothing in the record to suggest that Mayor Baca intentionally discriminated against Ms. Hardeman because of her race when he denied her a post-termination contract. It is true that there seems to be little direct evidence of intentional race-discrimination at the post-termination stage. However, as the district court noted, "direct evidence of discriminatory intent or purpose usually is unavailable in these types of cases. Instead, reasonable inferences drawn from circumstantial evidence may be sufficient to support a finding of discrimination." Aplts' App. vol. I, at 189 (internal citation omitted).

The district court concluded that "Defendant Baca's own testimony largely supported the inference that he perceived Plaintiff as closely associated with, and the catalyst behind, the African-American community's criticism of his administration because she was black . . . [t]his reflects an improper racial attitude towards Plaintiff." *Id.* at 190. Furthermore, Ms. Hardeman produced evidence that Mayor Baca dealt with problems involving non-African-American department heads differently than he did with Ms. Hardeman, the only African-American department head; that he failed to investigate the issue when he became

aware of allegations that the auditing department was targeting African-Americans; and that he took "multiple adverse steps" toward the remaining African-American employees at the Convention Center after Ms. Hardeman's resignation. Aple's Br. at 21. Thus, there is circumstantial evidence of Mayor Baca's possible animus toward African-Americans. This evidence, when looked at in its entirety and viewed in the light most favorable to Ms. Hardeman, is sufficient to support SVF 3.

### 3. Duplicative Awards

The defendants' final argument with respect to SVF 3 is that SVF 3 and SVF 4 are duplicative because

> both verdicts address the same parties (Baca and the City) and the same conduct (depriving Plaintiff of a post-termination contract) and both verdicts assess the identical odd number (not obviously related to any item of damage) as compensatory damages ($31,225) and the same excessive, disproportionate amount of punitive damages ($1 million).

Aplts' Br. at 25-26. They argue that the prohibition on double recovery precludes recovery under SVF 3. This argument is unpersuasive. Though SVF 3 and SVF 4 address the same parties and both are focused on the denial of the post-termination contract, as the district court emphasized, "Defendant[s] conveniently ignore that forms 3 and 4, rather than overlapping, address two separate legal wrongs–discrimination based on race in violation of the Fourteenth Amendment and discrimination based on political association in violation of the First

Amendment." Aplts' App. vol. I, at 192; *cf. Robertson Oil Co. v. Phillips Petroleum Co.*, 14 F.3d 373, 382 (8th Cir. 1993) (holding that identical punitive damage awards for fraud and intentional interference with a business relationship were not duplicative even though they sprang from a single injury because "[t]he conduct . . . relevant to an award of punitive damages necessarily differs according to the various theories of liability on which the jury based its verdict").

The prohibition on double recovery would undoubtedly bar Ms. Hardeman from being compensated twice for the loss of the $40,500 payment agreed to under the contract. But as Ms. Hardeman notes, the $31,225 awarded in compensatory damages on SVF 3 and SVF 4 "does not correspond to [her] proposed contract amount, therefore it is difficult too [sic] know the exact basis for the damages." Aple's Br. at 22 (internal quotation marks omitted). Thus, it seems the damages do not reflect the actual loss of the contract, but rather were "likely awarded for 'intangible damages' such as stress or compensatory damages caused by the retalitory denial of the contract due and/or the false and disparaging public campaign by [Mayor] Baca." *Id.* at 22. The district court also recognized this distinction, noting that "[t]his is not a case where alternative legal theories seek to remedy the same wrong," and emphasizing that "the Court was careful in Instruction 29 to inform, and on each of the verdict forms to remind the jury it could not award compensatory damages more than once for the same injury."

-22-

Aplts' App. vol. I, at 192 (internal citations and quotation marks omitted). As these two verdicts concern different theories of liability and compensate Ms. Hardeman for different injuries, the prohibition of double recovery is not implicated.

## C. Submission of SVF 4 to the Jury

The defendants argue that SVF 4 was submitted to the jury in error because it "permitted the jury to award damages against Defendants Baca and the City of Albuquerque if it found that 'Defendant Baca made disparaging public comments about Plaintiff *and/or* deprived [her] of a post-termination contract' based on her 'actual or perceived associations.'" Aplts' Br. at 12 (quoting Aplts' App. vol. I, at 159). They assert that 1) disparaging comments alone are not sufficient to support a First Amendment retaliation claim; and that 2) there is insufficient evidence to support the finding that the Mayor denied Ms. Hardeman the post-termination contract as a result of her associations, actual or perceived, with African-American groups.

### 1. Disparaging Comments

Defendants argue that the "and/or" wording of SVF 4 allowed the jury to award damages against Mayor Baca solely because he made disparaging comments about Ms. Hardeman and that disparaging comments alone cannot sustain a First Amendment retaliation claim. It seems, however, that defendants

waived their argument regarding the "and/or" wording of SVF 4 by failing to object at trial. When the court asked for objections to SVF 4, the defendants' attorney replied, "[T]his one is fine." Aplts' App. vol. V, at 1853. Accordingly, we review the defendants' challenge to the wording of SVF 4 for plain error. *Kloepfer v. Honda Motor Co.*, 898 F.2d 1452, 1456 (10th Cir. 1990). "To establish plain error, Defendant[s] must show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affect[s] substantial rights. If these three elements are satisfied, then we may exercise discretion to correct the error if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Ruiz-Gea*, 340 F.3d 1181, 1185 (10th Cir. 2003) (internal quotation marks omitted).

We have never found a First Amendment violation on the basis of disparaging comments alone. The defendants cite our decision in *Lybrook v. Members of the Farmington Municipal School Board*, 232 F.3d 1334 (10th Cir. 2000), for the proposition that while "employers' acts short of dismissal may be actionable as First Amendment violations, we have never ruled that *all* such acts, no matter how trivial, are sufficient to support a retaliation claim." *Id.* at 1340. They also rely heavily on our decision in *Phelan v. Laramie County Community College Board of Trustees*, 235 F.3d 1243 (10th Cir. 2000), in which we held that the censuring of a member of the college's board of trustees did not violate the

-24-

board member's First Amendment rights. *Id.* at 1248-49. Defendants interpret *Phelan* as holding that "an action will only trigger First Amendment concerns if it carries consequences that infringe protected speech." Aplts' Br. at 15.

Decisions of other circuit courts fall on both sides of this issue. The Seventh Circuit has held that a "campaign of petty harassments" can constitute a violation of the First Amendment, noting that "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982); *see also Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989) ("Harassment of a public employee for his political beliefs violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs."). Yet several circuits have declined to find a First Amendment violation on the basis of disparaging statements or verbal reprimands. *See Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000) (collecting cases); *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998) ("[M]ere accusations, without more, are not adverse employment actions.").

Given the ambiguity in the case law, it is not certain that the Mayor's disparaging comments actually violated Ms. Hardeman's First Amendment rights.

As there is some support for both sides of this issue, however, it is not "clear or obvious under current law," *Ruiz-Gea*, 340 F.3d at 1185, that SVF 4 was in error.

## 2. Sufficiency of the Evidence

The defendants also argue that SVF 4 was in error because "there was no evidence adduced at trial that Mayor Baca took any affirmative action to deny Plaintiff a contract or that Mayor Baca failed to take any action which resulted in the offer of the contract failing." Aplts' Br. at 19. It is clear that the Mayor intended to enter into a post-termination training contract with Ms. Hardeman; that this plan had been discussed with her; that Ms. Hardeman drafted a contract and sent it to the Mayor's chief administrative officer for his signature; that the news conference and newspaper articles in which African-American groups criticized the Mayor followed; that the Mayor expressed his disappointment in Ms. Hardeman through a phone message; and that the contract was never acted upon. However, there is essentially no direct evidence linking Ms. Hardeman's association with African-American groups and the denial of her post-termination contract. The defendants argue that "[t]he only thing Plaintiff proved was a chronology of events, one occurring in time after another, which is not sufficient to support the verdict." Aplts' Br. at 20. They insist that it was Mr. Rael who acted (or failed to act) on the contract and that Mayor Baca played no role in the denial of the contract.

Once again, direct evidence of discriminatory intent is often absent in this type of case. *See Durant v. Indep. Sch. Dist. No. 16*, 990 F.2d 560, 564 (10th Cir. 1993) ("[A]llegations of retaliation are often supported only by circumstantial evidence."). We have held that "[t]iming can be circumstantial evidence of retaliatory intent." *Poole v. County of Otero*, 271 F.3d 955, 961 (10th Cir. 2001). Given the suspicious timing of the denial of Ms. Hardeman's post-termination contract and the call Mayor Baca placed to Ms. Hardeman's home demanding an apology for her perceived involvement in the press conference, we agree with the district court that "the jury was entitled to reject Defendants' suggestion that Plaintiff's post-termination contract just fell through the cracks free from Defendant Baca's will or influence." Aplts' App. vol. I, at 190. Thus, we hold that there was sufficient evidence to support SVF 4.

**D. Submission of Punitive Damages to the Jury**

The jury awarded punitive damages on all four verdict forms, with a total of $2,250,000 in punitive damages against Mayor Baca on SVF 1A, SVF 3, and SVF 4, and $1 million in punitive damages against Ms. Trujeque on SVF 1B. In their Rule 50(b) motion, the defendants argued that there was insufficient evidence to support the punitive awards and that the damages were excessive. The district court rejected the defendants' insufficiency of the evidence claim, but it did issue a remittitur to reduce the punitive damages awarded on SVF 3 and

-27-

SVF 4 after determining that the damage awards were excessive. The district court decided that "a ratio of approximately 20 to 1 punitive damages to compensatory damages is most appropriate in this case," *id.* at 207, and consequently reduced the punitive damages on SVF 3 and SVF 4 from $1 million each to $625,000 each. The defendants now argue that 1) there was insufficient evidence to support the awards of punitive damages against the Mayor and Ms. Trujeque; 2) the punitive damage awards are still excessive, even after the district court's remittitur; and 3) the court erred in failing to instruct the jury that punitive damages could only be awarded against the defendants in their individual capacities. Ms. Hardeman argues that the original awards were not excessive and that the district court's remittitur should be reversed.

### 1. Sufficiency of the Evidence

The defendants argue that there is insufficient evidence to support the punitive damages awarded by the jury because "the evidence linking Mayor Baca's action terminating Plaintiff to Plaintiff's speech is minimal," Aplts' Br. at 39, and "the court did not find nor was there specific evidence that Defendant Trujeque's conduct was motivated by evil motive or intent or involved reckless or callous indifference." *Id.* at 40. "The district court's determination of whether sufficient evidence exists to support punitive damages is a question of law that we review *de novo*." *Nieto v. Kapoor*, 268 F.3d 1208, 1222 (10th Cir. 2001).

-28-

The defendants rely on *Guides, Ltd. v. Yarmouth Group Property Management, Inc.*, 295 F.3d 1065, 1077 (10th Cir. 2002), for the proposition that "the standard for punitive damages in actions claiming a violation of federal civil rights requires that the discrimination must have been malicious, willful, *and* in gross disregard of the rights of the plaintiff." *Id.* (emphasis added). The district court correctly rejected that standard, holding that a defendant's conduct does not have to be knowing or willful to support an award of punitive damages in a § 1983 action. Aplts' App. vol. I, at 184.

> Punitive damages are available in § 1983 actions [and] are to be awarded only when the defendant's conduct is shown to be motivated by evil motive or intent, *or* when it involves reckless or callous indifference to the federally protected rights of others. The focus must be on whether the defendant's actions call for deterrence and punishment over and above that provided by compensatory awards.

*Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1308 (10th Cir. 2003) (internal citations and quotation marks omitted) (emphasis added); s*ee also Quigley v. Rosenthal*, 327 F.3d 1044, 1070 (10th Cir. 2003) ("Although evidence that a defendant believed he was acting lawfully is pertinent to a determination of whether he acted with the sufficient state of mind to make the award of punitive damages appropriate, I do not find it to be dispositive of the issue.").

We recently held in *Youren* that sufficient evidence existed for a jury to consider the possibility of punitive damages because "[the plaintiff's] evidence in the record, if believed, appears to us to reflect actions that *should* be deterred and

-29-

punished" and the plaintiff's efforts to reveal "questionable activities" in the public school where she worked "were allegedly met with contempt, hostility, and anger." 343 F.3d at 1309. Similarly, Ms. Hardeman's evidence suggests that her efforts to "bring to light the questionable activities" within the Mayor's administration were met with "contempt, hostility, and anger." *Id.* If the jury chose to credit Ms. Hardeman's evidence, it would have had reason to conclude that Mayor Baca and Ms. Trujeque were recklessly or callously indifferent to Ms. Hardeman's federally protected free speech and free association rights. Thus, sufficient evidence existed to support the finding of punitive damages.

## 2. Excessiveness

"[I]t is well established that there are procedural and substantive constitutional limitations on [punitive damage] awards," and that "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 123 S. Ct. 1513, 1519-20 (2003). In analyzing the constitutionality of punitive damages, the Supreme Court has instructed courts to look to 1) the degree of reprehensibility of the defendant's action; 2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and 3) the difference between the punitive damage award and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc.*

*v. Gore*, 517 U.S. 559, 574-75 (1996). With respect to the second factor, the ratio of actual or compensatory damages to punitive damages, the Supreme Court has recently held that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 123 S. Ct. at 1524. The Court has explicitly stated that "courts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards." *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001).

In addition to challenging the excessiveness of a punitive damage award constitutionally, a defendant may also make a common law challenge to a punitive damage award by arguing that the "award [is] so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *Telecor Communications, Inc. v. Southwestern Bell*, 305 F.3d 1124, 1143 (10th Cir. 2002). Unlike constitutional challenges, we review the district court's disposition of a motion for remittitur or new trial based on a common law excessiveness claim for abuse of discretion. *Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1282 (10th Cir. 2003) ("Failure to remit a damage award or to award a new trial on the ground of excessiveness will not be disturbed on appeal absent a

gross abuse of discretion.") (internal quotation marks omitted).

It appears that the defendants' excessiveness claim before the district court was a common law challenge and not a constitutional one. As the court observed, "[n]otably, Defendants expressly indicate they do *not* seek review from this Court as to the awards' constitutionality." Aplts' App. vol. I, at 202. The defendants assert that they preserved their constitutional excessiveness claim by citing the *BMW* factors in their memorandum in support of their Rule 59 motion and including a single footnote that reads: "Defendants do not by this argument waive any right they may have to challenge the jury's punitive damage awards expressly on constitutional grounds on appeal." Aple's Supp. App., at 13. Immediately after citing the *BMW* factors, however, the defendants declare that "these factors are not controlling here since *Defendants seek a discretionary grant of a new trial or alternate relief, rather than a determination of the awards' constitutionality*." *Id.* (emphasis added). The footnote alone is not sufficient to preserve the constitutional challenge, as "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *see also United States v. Zenon-Rodriguez*, 289 F.3d 28, 35 (1st Cir. 2002) ("An argument made off-hand in one sentence of a motion is not sufficient to preserve an issue.").

Based on these facts, we agree with Ms. Hardeman that the defendants

failed to preserve their constitutional challenge to the size of the punitive damage

awards. *See Rivera-Torres v. Ortiz Velez*, 341 F.3d 86, 102 (1st Cir. 2003)

(holding that defendants failed to preserve their challenge to a punitive damage

award because they "did not move for a new trial after the jury delivered its

verdict, or file a post-trial motion to reduce or set aside the verdict as excessive"

and therefore "failed to allow the district court to rule on the matter"); *Scheidt v.*

*Klein,* 956 F.2d 963, 970 (10th Cir. 1992) (deeming defendant's argument that

punitive damages were excessive in light of a state statute waived because

"[d]efendant never raised the issue below, despite ample opportunity to do so,

both in his request for remittitur and following the district court's orders

conditionally granting and then effecting the requested reduction with respect to

compensatory damages without any adjustment of punitive damages").  Though

the defendants did file a post-trial motion challenging the excessiveness of the

punitive damage awards, they did not provide the district court with an

opportunity to review the awards' constitutionality.  We therefore limit our review

to the common law standard, examining whether the remitted verdicts remain "so

excessive or inadequate as to shock the judicial conscience and to raise an

irresistible inference that passion, prejudice, corruption or other improper cause

invaded the trial," *Telecor Communications, Inc.*, 305 F.3d at 1143, and

recognizing that we should not alter the district court's disposition of the motion

for remittitur "absent a gross abuse of discretion." *Century 21 Real Estate Corp.*, 315 F.3d at 1282.

Given this standard of review, we will not disturb the district court's determination that punitive damages in the amount of $625,000 are appropriate with respect to both SVF 3 and SVF 4. "We have said that, even where a persuasive explanation of the jury's damages award indicates an award contrary to law, the possibility of a proper explanation, however slight the chance, will suffice to sustain the damages award." *Telecor Communications, Inc.*, 305 F.3d at 1143 (internal quotation marks omitted). There is more than a mere possibility that the punitive damage awards in this case were properly intended "to punish what has occurred and to deter its repetition." *Youren*, 343 F.3d at 1309 (internal quotation marks omitted). The defendants are correct in noting that the ratio of punitive to compensatory damages on SVF 3 and SVF 4 is still very high, but as the district court explained, the *BMW* factors, including the ratio of actual to punitive damages, are "instructive" but "not 'technically' controlling." Aplts' App. vol. I, at 204. We have previously rejected a common law challenge to a punitive damage award where the ratio of punitive to compensatory damages was just over twenty-one to one, holding that such a ratio "alone does not require reduction." *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1249 (10th Cir. 1999).

In addition to rejecting the defendants' claim concerning the excessiveness of the damages, we also easily reject Ms. Hardeman's claim that the remittitur was in error and that the jury's original punitive awards of $1 million on SVF 3 and SVF 4 should be restored. As noted above, "[w]e review a district court's disposition of a motion for remittitur or new trial on damages for a manifest abuse of discretion," *Telecor Communications, Inc.*, 305 F.3d at 1143. Given the size of the punitive awards and the original thirty-two to one ratio of punitive to compensatory damages on SVF 3 and SVF 4, we certainly cannot conclude that the district court abused its discretion in issuing the remittitur.

### 3. Failure to Instruct the Jury on Individual Capacity

The defendants assert that the court erred by failing to instruct the jury that punitive damages could only be awarded against Mayor Baca and Ms. Trujeque in their individual capacities, as the city has immunity from punitive damages. They also argue that if the issue of punitive damages is remanded, "[defendants'] financial considerations [should] be considered without reference to City funds." Aplts' Br. at 45.

"We consider jury instructions in their entirety, applying *de novo* review to determine whether the jury was misled on the applicable law. Despite this standard of review, we do not require perfection, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its

-35-

duty to resolve them." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1250 (10th Cir. 2000) (internal quotation marks omitted). "Our concern is to ensure that our review does not leave us with substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations." *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1235 (10th Cir. 1999) (internal quotation marks omitted). We have repeatedly held that "no particular form of words is essential if the instruction as a whole conveys the correct statement of the applicable law." *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1365 (10th Cir.1994) (internal quotation marks and alteration omitted).

While the jury instructions did not use the term "individual capacity," viewed as a whole, they made it clear that the city could not be assessed punitive damages and that the damages were being assessed against the individual defendants. As the district court acknowledged, Instruction 39 clearly informed the jury that "Defendant City of Albuquerque, as a municipality, is immune from punitive liability or punitive damages." Aplts' App. vol. I, at 141. Instruction 37, also concerning the assessment of punitive damages, refers to the "individual Defendants" five separate times, instructing the jury that the law allows it to "assess punitive damages against one or both *individual* Defendants as punishment and as a deterrent to others." *Id.* at 139 (emphasis added). Viewing these instructions in their entirety, the jury was clearly informed that the city

could not be assessed punitive damages, and nothing in the record suggests that the instructions did not convey the law correctly. As we do not believe that the jury instructions were in error, we need not reach the defendants' argument regarding whether their financial status should be considered on remand.

### III. CONCLUSION

Having found that the defendants failed to satisfy the requirements for relief under Rule 50(b) or Rule 59, we AFFIRM the district's court denial of defendants' motion for judgment as a matter of law and motion for a new trial, remittitur, and to alter or amend the judgment.

To the extent there are any issues in Ms. Hardeman's cross-appeal that remain outstanding, we grant the defendants' motion to dismiss those issues. Ms. Hardeman does not contest the dismissal.