**M.D. MARK, INC., Plaintiff–Appellee–Cross–Appellant,**

v.

**KERR–McGEE CORPORATION; Oryx Energy Company, Defendants–Appellants–Cross–Appellees.**

Nos. 08–1040, 08–1047, 08–1236.

United States Court of Appeals, Tenth Circuit.

May 11, 2009.

Marie R. Yeates of Vinson & Elkins L.L.P., Houston, TX, (Penelope E. Nicholson, Gwendolyn J. Samora, Abigail W. Giraud, Robert R. Russell of Vinson & Elkins L.L.P., Houston, TX; Scott S. Barker, Marcy G. Glenn, Gregory E. Goldberg, M. Antonio Gallegos of Holland & Hart LLP, Denver, CO, with her on the briefs), for Defendants–Appellants–Cross–Appellees.

Bradley A. Levin of Roberts Levin Rosenberg PC, Denver, CO, (Thomas L. Roberts of Roberts Levin Rosenberg PC; Harlan P. Pelz, Susan F. Fisher, Kieran A. Lasater, of Fairfield and Woods, P.C., Denver, CO; Daniele W. Bonifazi of Bonifazi & Associates, LLC, Centennial, CO, with him on the briefs), for Plaintiff–Appellee–Cross–Appellant.

Before BRISCOE, SEYMOUR, and LUCERO, Circuit Judges.

BRISCOE, Circuit Judge.

Plaintiff M.D. Mark, Inc. (Mark) filed this action alleging that defendants Kerr–McGee Corporation (Kerr–McGee) and Oryx Energy Company breached the terms of seismic data license agreements and also misappropriated seismic data owned by Mark. Mark prevailed on its claims at trial and was awarded $25,266,381.00 in compensatory damages.

Kerr–McGee now appeals, attacking each aspect of the jury's liability findings, as well as the amount of the damage award. Mark has filed two cross-appeals, the first of which challenges, on a provisional basis, three of the district court's rulings at trial, and the second of which challenges the district court's denial of its motion for attorney fees. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's judgment in all respects.

# I

## PGI, Mark and the seismic data

In the 1970's and 1980's, a Texas-based company called Professional Geophysics, Inc. (PGI) developed, at substantial expense, a collection of geophysical information called seismic data. PGI in turn licensed that data, for a fee, to members of the oil and gas industry for exploration purposes. In 1991, PGI declared bankruptcy and Mark, a Texas-based company, purchased PGI's database for $1.4 million, or approximately $53 per mile for approximately 26,000 miles of data. Mark then began, and continues to this day, to license that data.

## Sun/Oryx

In the early 1980's, the Sun Exploration & Production Company (Sun), a Delaware corporation headquartered in Houston, Texas, entered into a series of license agreements with PGI covering approximately 16,000 miles of seismic data. In December 1985, Sun created a subsidiary called Sun Operating Limited Partnership (SOLP) and transferred to it a group of assets, including the seismic data licensed from PGI. In doing so, however, Sun apparently did not transfer to SOLP any of the underlying license agreements. In May 1989, Sun changed its name to Oryx Energy Company (Oryx).

## Kerr–McGee

Between 1984 and 1994, Kerr–McGee, an Oklahoma-based corporation, entered into a series of license agreements in its own name with PGI and Mark covering approximately 775 miles of seismic data. Kerr–McGee itself, however, did not engage in any oil or gas exploration. Instead, all such exploration was conducted by its subsidiaries, including Kerr–McGee Oil and Gas Corporation (KMOG).

## Merger between Kerr–McGee and Oryx and subsequent changes

On October 14, 1998, Kerr–McGee and Oryx entered into a written agreement pursuant to which Oryx would merge into Kerr–McGee. That merger was approved by the companies' shareholders on February 26, 1999.

## Communications between Oryx/Kerr–McGee and Mark re merger

On October 16, 1998, Mark, aware of the pending merger between Kerr–McGee and Oryx, sent a letter to Oryx reminding it that Oryx had licensed "certain PGI ... seismic data" and that "[t]hose licenses [we]re not transferable, as stated in the agreements." App. at 1936. The letter went on to state:

> However, M.D. Mark will allow the data to be transferred and licensed to Kerr–McGee upon the payment of a transfer fee and the execution of a current M.D. Mark license agreement. This offer to transfer the data is valid for thirty (30) days from the date of this letter. If, however, Kerr–McGee does not wish to transfer the data, then M.D. Mark is requesting the immediate return of its data within thirty (30) days.

Id. Oryx apparently responded to the letter by telephoning Mark and asking addi-

tional questions about the proposed transfer fee. *Id.* at 1919.

On November 11, 1998, Marilyn Davies, the president of Mark, sent another letter to Oryx stating, in pertinent part:

As we discussed, M.D. Mark would authorize Kerr McGee to have access to this seismic data for about $200 per mile if all of the data was retained. The fee would go higher if Kerr McGee chose to retain only certain data sets instead of the entire volume. As you know, the current price for most of this data is $1200 per mile with discounts for volume deals. M.D. Mark's fee is just about 10% of the current fee. With the authorization of access, M.D. Mark would require Kerr McGee to execute a new license agreement in its name agreeing to protect the data of M.D. Mark.

Since the actual consummation of the [merger] deal won't take place until 1st Quarter 1999, M.D. Mark will extend its offer to transfer the data until thirty (30) days after the merger/consolidation/control change date.

*Id.*

No further response was received from Oryx until February 11, 1999, when Patricia Horsfall, Oryx's manager of exploration, sent a letter (prepared for her by Kerr–McGee's in-house attorney Carlos Salazar) to Mark stating, in pertinent part:

Contingent upon approval of the merger by the companies' shareholders, your records will need to be changed to reflect the name change of the Licensee, under the referenced Seismic Data License Agreement(s), from Oryx Energy Company to Kerr–McGee Oil & Gas Corporation, a subsidiary of Kerr–McGee, located in Houston.

*Id.* at 1939.

On February 17, 1999, Davies sent a letter to Horsfall stating that "the PGI seismic [data] *is not transferable, assignable, etc.* and cannot be made available to Kerr–McGee without prior written approval from M.D. Mark and the payment of an authorization or transfer fee." *Id.* at 1925 (emphasis in original). Davies' letter further stated that, in the absence of such authorization or transfer fee, "the licenses of all PGI seismic data in Oryx's possession w[ould] be automatically terminated" upon the closing of the merger, and all "data must be returned." *Id.*

On March 26, 1999, Salazar, Kerr–McGee's in-house counsel, sent a letter to Mark stating:

Please be advised that Kerr–McGee Corporation will not pay a transfer fee for any data subject to a license from PGI to Oryx Energy Company or any of its predecessors. We are in the process of packaging all data identified on our records as being subject to any such license and will be shipping it to you as soon as packaging is complete.

*Id.* at 1926.

On March 31, 1999, Davies acknowledged Salazar's March 26, 1999 letter and requested that all data be "returned to [Mark's] storage facilities" in Houston, Texas. *Id.* at 1927. Davies' letter outlined all of the types of material that needed to be returned to Mark, and stated, in conclusion, "that any and all licenses to PGI seismic data re [sic] now terminated." *Id.* at 1928.

Shortly thereafter, however, Kerr–McGee changed its position. On April 8, 1999, Salazar sent Mark a letter stating:

We have just been made aware of the decision of the appellate court in your case, *TXO Production Co. and Marathon Oil Co v. M.D. Mark, Inc.*

Please be advised that Kerr–McGee has put on hold the return to you of any PGI

data, pending final resolution of this case.

*Id.* at 1929.

On July 26, 1999, Davies sent Salazar a letter stating, in pertinent part:

There is, of course, no provision in your contract which allows you to rely upon PGI or MDM's transactions with other parties. The issues involved in the Marathon matter were decided in MDM's favor in the trial court. However, as we all know, we are perhaps years away from a resolution in the appeals courts. Moreover, the issues and underlying facts are different than those of the Oryx transaction with PGI. Would you please tell me on what basis, Kerr–McGee has the right to hold the data previously licensed to Oryx?

*Id.* at 1930.

Salazar responded to Davies' letter on August 13, 1999, stating:

Kerr–McGee Corporation disagrees with your interpretation of the recent decision of the Texas Court of Appeals in your case against TXO Production Company and Marathon Oil Company. In its decision, the Appeals Court reviewed the Texas merger statute and very clearly ruled that a provision prohibiting transfers to third parties does not apply in the case of a merger unless the provision specifically says so. Our agreements with PGI do not provide that a transfer is prohibited even in the event of a merger.

The facts in our case are in fact almost identical to those in your case with TXO and Marathon and our agreements with PGI contain the very same language which the Appeals Court interpreted. Therefore, as the surviving corporation in the statutory merger with Oryx,

Kerr–McGee Corporation has the right to retain the Oryx PGI data without paying a transfer fee. We are also confident that the Texas Supreme Court will agree with the Appeals Court decision, if presented with the issue.

*Id.* at 1931.

On August 16, 2000, Davies sent a letter to Salazar stating that "[t]he option of returning the data ha[d] been withdrawn," and enclosed an invoice in the amount of $3,000,000 "reflecting the charges based on the discount given to a volume license purchase." *Id.* at 1933. On August 29, 2000, Salazar sent a letter to Davies stating that it "remain[ed] [Kerr–McGee's] intention to retain the data ... and to *not* pay a transfer fee." *Id.* at 1932 (emphasis in original).

### This lawsuit

On February 16, 2001, Mark filed suit against Kerr–McGee and Oryx in Colorado state court asserting claims for misappropriation of trade secrets, breach of contract, tortious interference with contract, and unjust enrichment. On March 7, 2001, Kerr–McGee removed the action to federal district court in Colorado, premised on diversity jurisdiction.

During discovery, it was determined that Kerr–McGee was in possession of 3,175 miles of Mark's seismic data that was not covered by any of the existing license agreements between PGI or Mark and Kerr–McGee, Sun, or Oryx. This discovery gave rise to an additional claim of misappropriation by Mark against Kerr–McGee.

The final pretrial order in this action, issued on November 22, 2006, noted that Mark asserted five claims for relief: (1) misappropriation of trade secrets against Oryx[1]; (2) misappropriation of trade se-

---

1. The parties stipulated that the seismic data      originally owned by PGI and now owned by

crets against Kerr–McGee; (3) breach of contract against Oryx and Kerr–McGee; (4) tortious interference with contract; and (5) civil conspiracy. The pretrial order noted that, although Oryx no longer existed because it merged into Kerr–McGee in 1999, Mark "claim[ed] some of the acts of the Defendants arose before the merger between the two companies" and that, "[a]s a result of the merger," "all claims [we]re now against Kerr–McGee...." *Id.* at 82.

The case proceeded to trial on September 17, 2007. During trial, the parties and the district court focused on three categories of seismic data underlying Mark's claims [2]:

Category 1 Data—this category encompassed approximately 15,745 miles of seismic data licensed by Sun/Oryx from PGI/Mark prior to Oryx's merger into Kerr–McGee;

Category 2 Data—this category encompassed the 775 miles of seismic data licensed directly by Kerr–McGee from PGI/Mark prior to the merger; and

Category 3 Data—this category encompassed approximately 3,175 miles of seismic data found during discovery to be in Kerr–McGee's possession but not covered by any pre-existing license agreements (this is sometimes referred to as the "bootleg data").

At the conclusion of all the evidence, the jury found that:

- Oryx breached one or more of the license agreements it entered into with PGI/Mark, covering Category 1 data, by "trans ferr[ing] the license agreement[s] to Kerr McGee Corp, without

prior approval," *id.* at 664, and that Mark suffered $15,745,000 in damages as a result of the breach;

- Kerr–McGee breached one or more of its own pre-merger license agreements with PGI/Mark, covering Category 2 data, by "transfer[ring] license[s] to Kerr McGee Oil & Gas [Corporation]" without "prior consent," by failing to return all data to Mark, and by failing to safeguard Mark's trade secrets, and that Mark suffered $968,750 in damages as result of this conduct, *Id.* at 666; and

- Kerr–McGee "gained access to and possessed PGI data [i.e., Category 3 data] through improper means" beginning in at least 1996, *id.* at 667, Kerr–McGee also, after the merger with Oryx, wrongfully transferred control of the Category 1 data to a Kerr–McGee subsidiary, *id.,* and that Mark suffered $25,266,381 in damages as a result of Kerr–McGee's misconduct regarding the Category 1 and Category 3 data.

On September 28, 2007, the district court entered judgment in favor of Mark and against Kerr–McGee in the amount of $25,266,381.00. In doing so, the district court purportedly "applied the rule prohibiting multiple recovery" and "awarded [Mark] only that amount of damages determined by the jury to constitute the entirety of ... Mark's losses on its tort claim." *Id.* at 834. Mark moved to amend the judgment pursuant to Fed.R.Civ.P. 59(e), and asked the district court "to stack the awards and enter judgment in the combined amounts reflected on ... the

Mark constituted a trade secret. App. at 1165.

**2.** At trial, the parties also referred to "Category 4 Data," which encompassed several thousand miles of the Category 1 Data that could

not be located by Kerr–McGee at the time it attempted to return the Category 1 Data to Mark during the course of this lawsuit. The Category 4 Data is not relevant for purposes of this appeal.

Verdict Form and to award it prejudgment interest on that amount." *Id.* The district court denied Mark's motion "with regard to the request for the stacking of the breach of contract and tort damages awards," but granted the motion with regard "to the request for prejudgment interest." *Id.* at 837. Accordingly, the district court entered an amended judgment reflecting the prejudgment interest awarded to Mark. The district court also denied Mark's motion for attorney's fees. Kerr–McGee filed a post-trial motion entitled "Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) or Alternatively, Motion for New Trial, for Remittitur, and/or to Alter and Amend the Judgment Pursuant to [Rule 59 and] Rule 59(e)," "urg[ing] [the district court] on numerous grounds either to throw out the jury's verdict and enter judgment in its favor, to enter judgment for a greatly reduced amount, or to order a new trial." *Id.* at 834–35. The district court rejected Kerr–McGee's motion in its entirety.

On February 14, 2008, Kerr–McGee filed a notice of appeal from the district court's amended judgment (resulting in Appeal No. 08–1040). On February 25, 2008, Mark filed a notice of cross-appeal from the district court's amended judgment (resulting in Appeal No. 08–1047). On July 3, 2008, Mark filed a notice of appeal from the district court's order denying its motion for attorney's fees (resulting in Appeal No. 08–1236).

## II

### *Kerr–McGee's appeal-No. 08–1040*

Kerr–McGee asserts five general issues in its appeal. In the first three of those issues, Kerr–McGee attempts to challenge the validity of each of the jury's liability findings. Kerr–McGee's fourth issue concerns the proper remedy in the event we conclude the jury's misappropriation find-

ings are not sustainable. Lastly, Kerr–McGee's fifth issue concerns the purported excessiveness of the damages awarded by the jury. We address these issues in order.

### 1. Challenges to the jury's liability findings regarding Category 1 Data

As noted, the jury found in Mark's favor on two claims regarding the Category 1 Data, i.e., that Oryx breached the terms of one or more of its license agreements with PGI/Mark by transferring those license agreement(s) to Kerr–McGee without approval from Mark, and that Kerr–McGee, post-merger, wrongfully transferred control of the Category 1 data to one of its subsidiaries. On appeal, Kerr–McGee challenges both of these liability findings.

### a) The jury's finding that Oryx breached the terms of one or more license agreements

Kerr–McGee first attacks the jury's finding that Oryx breached the terms of one or more of its license agreements with PGI/Mark by transferring those license agreement(s) to Kerr–McGee without Mark's approval. More specifically, Kerr–McGee notes that the district court instructed the jury (in Instruction No. 3.2.3) that "[a] merger between a licensee and another entity will breach the terms of the licensee's agreement with a licensor only if the license agreement so provides," *id.* at 895, and it asserts that none of those license agreements expressly made merger a breach.

The threshold question we must resolve is what standard of review to apply in analyzing Kerr–McGee's arguments. Unfortunately, Kerr–McGee does not clearly specify whether it is seeking to challenge the district court's denial of its Rule 50(b) motion for judgment as a matter of law or

its Rule 59 motion for new trial. Reviewing the record on appeal, we note that the arguments currently asserted by Kerr–McGee were first presented in its Rule 50(a) motion at the close of Mark's evidence, and later in the Rule 50(b) portion of its combined post-trial brief. We therefore conclude that Kerr–McGee is challenging the district court's denial of its Rule 50(b) motion for judgment as a matter of law.

■ We review de novo a district court's denial of a Rule 50(b) motion, drawing all reasonable inferences in favor of the nonmoving party, in this case, Mark. *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1112 (10th Cir.2004). In doing so, we will reverse a district court's refusal to grant judgment as a matter of law only "if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Id.* (internal quotation marks omitted).

■ After reviewing the trial transcript, we conclude that Kerr–McGee was not entitled to judgment as a matter of law with respect to the issue of whether Oryx breached the terms of one or more of its license agreements with PGI/Mark. During its case-in-chief, Mark presented testimony from Leon Herzog, an individual who had worked for a variety of seismic data owners, including Mark, and was familiar with license agreements typically used in the seismic data industry. Mark questioned Herzog about the language of the pre-merger license agreements between Sun/Oryx and Mark/PGI. Herzog opined that those license agreements, including both the "Type A" and "Type B" agreements now referred to by Kerr–McGee[3], precluded Oryx from assigning the agreements or underlying data to Kerr–McGee via merger, and would have required Kerr–McGee to enter into a new agreement with Mark.App. at 1090–91, 1092, 1103. Mark also presented the testimony of Robert Gray, a geophysicist who was accepted by the district court as an expert on custom and practice in seismic data licensing. *Id.* at 1112. Like Herzog, Gray opined that language of the type used in the Type A agreements at issue precluded the licensee from transferring the license agreement via merger. *Id.* at 1114. Lastly, Mark presented testimony from John Moye, a Denver-based attorney who the district court recognized as an expert on mergers and contracts. Moye opined that the language of the Type A agreements "prohibit[ed] the disclosure [of seismic data] to any other third person." *Id.* at 1060. Similarly, Moye opined that the language of the Type B agreements allowed for seismic data to be conveyed to a surviving company in the event of a merger only if certain requirements, including the signing of a sublicense agreement and the payment of a fee, had been met. *Id.* at 1063. In light of this testimony, we readily conclude the district court did not err in denying Kerr–McGee's Rule 50(b) motion with respect to the jury's finding that Oryx breached the terms of one or more of its license agreements with PGI/Mark by transferring those license agreement(s) to Kerr–McGee without Mark's approval.

---

**3.** Kerr–McGee has employed the terms "Type A" and "Type B" to refer to the two general types of form contracts utilized by PGI/Mark in licensing data to Sun/Oryx. The Type A agreements provided that "[t]he data covered [there]under ... [wa]s for the sole use of Purchaser and [wa]s not to be sold, traded, disposed of or otherwise made available to other parties...." App. at 1695. The Type B agreements authorized the licensee to "disclose the Data by providing copies thereof ... to a surviving company in the event of a complete merger by Licensee," but not until such surviving company had executed a sublicense for the data and paid a "group rate fee" for the copies of data. *Id.* at 1649.

### b) The jury's finding that Kerr–McGee, post-merger, wrongfully transferred control of the Category 1 data to one of its subsidiaries

Kerr–McGee also attacks the jury's findings that Oryx and Kerr–McGee misappropriated Category 1 seismic data. More specifically, Kerr–McGee contends that there was no evidence of any "wrongful transfer" of the Category 1 data from Oryx or Kerr–McGee to a Kerr–McGee subsidiary, as was necessary to a finding of misappropriation under the district court's instructions. According to Kerr–McGee, the evidence presented at trial established that all of the Category 1 data was transferred by Sun/Oryx to SOLP prior to the merger, and that after the merger, the Category 1 data "was not transferred to any other entity, but rather remained where it had been for almost 15 years—in SOLP." Aplt. Br. at 33. Although Kerr–McGee acknowledges that in July of 1999 SOLP changed its name to Kerr–McGee Oil & Gas Onshore LP (Onshore LP) and Kerr–McGee assigned its direct ownership in Onshore LP to an intermediate subsidiary, Kerr–McGee Oil & Gas Onshore LLC, it asserts that these events did not effectuate a transfer of SOLP's original assets, including the Category 1 data.

■ The threshold question we must again address is what standard of review to apply to Kerr–McGee's arguments. Turning to the record on appeal, the specific arguments now asserted by Kerr–McGee were presented to the district court in the Rule 50(b) portion of its post-trial motion. Importantly, however, Kerr–McGee did not assert these arguments in its Rule 50(a) motion at the close of Mark's case-in-chief, and is thus precluded from

relying on them as a basis for Rule 50(b) relief.[4] See Marshall v. Columbia Lea Reg'l Hosp., 474 F.3d 733, 738 (10th Cir. 2007) (holding that a "pre-verdict Rule 50(a) motion" is "a prerequisite to a post-verdict motion under Rule 50(b)").

That leaves only the possibility of Rule 59 relief, i.e., the granting of a new trial. In the Rule 59 portion of its post-trial motion, Kerr–McGee argued, in summary fashion, that "the jury's finding that, *after the merger*, Kerr–McGee 'wrongfully transferred' the 16,000 miles of Oryx seismic data to a Kerr–McGee subsidiary [wa]s decidedly and overwhelmingly against the weight of the evidence." App. at 711–12 (emphasis in original). Out of an abundance of caution, we shall treat this summary argument as incorporating, by reference, the more detailed arguments Kerr–McGee asserted in the Rule 50(b) portion of its post-trial motion. In turn, we will treat Kerr–McGee's appellate arguments as a challenge to the district court's denial of its motion for new trial.

■ We review for abuse of discretion a district court's denial of a motion for new trial under Rule 59(a). Sanjuan v. IBP, Inc., 275 F.3d 1290, 1297 (10th Cir.2002). If "a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." Anaeme v. Diagnostek, Inc., 164 F.3d 1275, 1284 (10th Cir.1999) (internal quotation marks omitted).

■ After reviewing the record on appeal, we conclude that Kerr–McGee's arguments do not justify the granting of a new trial. It is true that Kerr–McGee present-

4. The district court addressed Kerr–McGee's arguments on the merits, but did not specifically identify whether it was viewing them under the lens of Rule 50(b) or Rule 59. For the reasons outlined above, it is clear that the district court would have been confined to treating the arguments as having been asserted only pursuant to Rule 59.

ed evidence in its defense suggesting that the Category 1 data was not transferred to KMOG, and instead "was left in the former Oryx subsidiary SOLP...." Aplt. Br. at 30 (citing App. at 1291). However, Mark presented evidence during its case-in-chief that, viewed in the light most favorable to Mark, would have allowed the jury to reasonably infer that Kerr–McGee in fact transferred the seismic data to KMOG. Most notably, Mark presented the testimony of Carlos Salazar, Kerr–McGee's former in-house counsel who drafted the Horsfall letter and subsequently engaged in direct communications with Mark regarding whether Kerr–McGee would pay Mark a transfer fee following the Kerr–McGee/Oryx merger. Salazar acknowledged that in the Horsfall letter, as well as in similar letters he drafted for Kerr–McGee to send to its other seismic data licensors, he advised that, following completion of the Kerr–McGee/Oryx merger, Kerr–McGee intended to transfer its seismic data to KMOG. During cross-examination, Kerr–McGee did not ask Salazar whether the proposed transfer of data to KMOG actually took place. Notably, however, Salazar was asked on redirect whether the data was "transferred to a new subsidiary of Kerr–McGee Corporation...." App. at 1196. Salazar responded: "Once—well, for lack of a better word—I mean, they weren't physically assigned to Kerr–McGee Oil & Gas Corporation. They were—on the books they were given responsibility—or Houston—Kerr–McGee Oil & Gas Corporation was given responsibility and authority for the offshore assets that had been acquired [via the merger]." *Id.* In addition to Salazar's testimony, the evidence presented at trial also suggested that the employees of Kerr–McGee and its subsidiaries generally paid little heed to corporate formalities, instead viewed Kerr–McGee and its subsidiaries as a "family," and readily shared seismic data without regard to any limitations imposed by the underlying license agreements. In light of this evidence, we cannot say that the jury's misappropriation findings were "clearly, decidedly, or overwhelmingly against the weight of the evidence." *Anaeme,* 164 F.3d at 1284.

### 2. Challenges to the jury's liability findings regarding Category 2 Data

The jury found, with regard to the Category 2 data, that Kerr–McGee breached one or more of its own pre-merger license agreements with PGI/Mark by "transfer[ring] license[s] [covering Category 2 data] to Kerr McGee Oil & Gas," i.e., KMOG, without "prior consent," by failing to return all data to Mark, and by failing to safeguard Mark's trade secrets. App. at 666. Kerr–McGee contends on appeal that the jury's findings cannot be sustained because (1) there was no evidence of any assignment to KMOG of a license to Category 2 data, (2) Kerr–McGee did not have a duty to return data to Mark under the terms of the parties' 1994 license agreement, and (3) Kerr–McGee did not have any duty to account for the Category 2 data during the thirty-year term of the 1994 license agreement. Kerr–McGee also asserts that Mark has suffered no damages as a result of the purported failure to return or safeguard the Category 2 data.

Kerr–McGee raised these arguments for the first time in both the Rule 50(b) and the Rule 59 portions of its post-trial motion. Because, however, Kerr–McGee did not assert these arguments in its Rule 50(a) motion at the close of Mark's case-in-chief, it is precluded from obtaining Rule 50(b) relief on the basis of those arguments. Thus, we confine our review to determining Kerr–McGee's arguments justify the granting of a new trial under Rule 59.

As previously noted, Mark presented, during its case-in-chief, the testimony of Kerr–McGee's in-house attorney Carlos Salazar. Salazar testified, in pertinent part, that Kerr–McGee itself did not engage in any oil and gas exploration. *Id.* at 1171. Instead, Salazar testified, such exploration was handled by Kerr–McGee's subsidiaries. *Id.* Further, Salazar testified that he and other Kerr–McGee employees "considered [Kerr–McGee] to be a family of companies," and "didn't ... see anything wrong with affiliates and subsidiaries exchanging [seismic data] information." *Id.* at 1172. Later, during Kerr–McGee's presentation of its own evidence, Thomas Schultz, a Kerr–McGee–employed geophysicist testified, under cross-examination by Mark's counsel, that (a) Kerr–McGee was headquartered in Oklahoma City, (b) KMOG was headquartered in Dallas, and (c) "the people who were using the seismic data after the merger were in Dallas," *id.* at 1279. Marilyn Young, a Kerr–McGee–employed attorney who oversaw Kerr–McGee's family of subsidiaries, testified as part of Kerr–McGee's evidence and admitted, under cross-examination by Mark's counsel, that "Kerr–McGee wanted all [of] its oil and gas exploration and development and production to go through" KMOG, *id.* at 1293, and that, in 2002, the subsidiaries were reorganized in a fashion such that KMOG oversaw Onshore LP, *id.* at 1294.

In addition to this testimony, the jury was presented with a copy of the 1994 Agreement between Kerr–McGee and Mark. That agreement, which expressly "supersede[d], modifie[d], amend[ed], and replace[d] all previous understandings and agreements" between the two parties, required Kerr–McGee, absent "written permission" from Mark, to "maintain the Data on its premises at all times" and prohibited Kerr–McGee from "provid[ing] copies [of the data] to third parties for removal from

[Kerr–McGee]'s premises for any purpose." *Id.* at 1807. Notably, the agreement provided that these requirements "appl[ied] even in the event of a corporate reorganization ... or a merger," and that "no disclosure" could "be made to any parties involved in such actions, even if such parties [we]re the surviving entities after such corporate reorganization ... or merger." *Id.* at 1806. Lastly, the agreement provided that in the event of a breach by Kerr–McGee, Mark could terminate the agreement and require the return of "all physical evidence of the Data including any reprocessing of the Data." *Id.*

■ In light of this evidence, we are unable to conclude that the jury's findings regarding the Category 2 data were "clearly, decidedly, or overwhelmingly against the weight of the evidence." *Anaeme*, 164 F.3d at 1284. Thus, in turn, we conclude that the district court did not abuse its discretion in denying Kerr–McGee's motion for new trial as to the Category 2 data issues.

### 3. Challenges to the jury's liability findings regarding Category 3 Data

The jury found that Kerr–McGee gained access to and possessed through improper means the Category 3 data. Kerr–McGee argues that these findings cannot be sustained because (a) mere possession of the Category 3 data does not prove misappropriation, (b) there was no evidence of theft, bribery, or misrepresentation on the part of Kerr–McGee, and (c) there was no evidence that Kerr–McGee breached, or induced another party to breach, any duty of secrecy.

Although Kerr–McGee frames its arguments as if it were seeking judgment as a matter of law pursuant to Rule 50(b), the record on appeal establishes that Kerr–McGee failed to seek Rule 50(a) relief on

the basis of these arguments. Indeed, in making its Rule 50(a) arguments at the close of Mark's case-in-chief, Kerr–McGee conceded "there [wa]s a jury issue" with respect to the Category 3 data. App. at 1245. Thus, Kerr–McGee's arguments must be considered solely under the standard of review applicable to Rule 59 rulings because Kerr–McGee asserted these arguments for the first time in the Rule 59 portion of its post-trial motion.

Before directly addressing Kerr–McGee's arguments, it is useful to first review the district court's jury instructions regarding Kerr–McGee's alleged misappropriation of the Category 3 data. The district court's instructions defined "misappropriation" as "the unauthorized disclosure of a trade secret, acquisition of a trade secret by improper means, or with knowledge or reason to know that the trade secret was acquired by 'improper means'; or the use of a trade secret without express or implied consent, after having used 'improper means' to acquire the trade secret." *Id.* at 899. Further, the phrase "improper means" was defined in the district court's instructions as "includ[ing] theft, bribery, misrepresentation, or breach—or inducement of a breach—of a duty to maintain secrecy or not to disclose a trade secret." *Id.*

■ Turning now to the evidence presented at trial, it is true, as asserted by Kerr–McGee, that Mark did not produce any direct evidence that Kerr–McGee acquired the Category 3 data by means of theft, bribery, misrepresentation, or breach or inducement of a breach of a duty

to maintain secrecy or not to disclose a trade secret. Importantly, however, Mark's evidence established that:

- Mark regularly maintained records of the data sets it licensed to third parties, and those records showed no license or delivery of the Category 3 data to Kerr–McGee, Oryx/Sun or any Kerr–McGee subsidiary;

- although Kerr–McGee was in possession of the Category 3 data, it could not produce a single employee, former or present, who could explain how Kerr–McGee obtained the data, when the data was obtained, or how or when it may have been utilized Kerr–McGee or any of its subsidiaries;

- Kerr–McGee could produce no license agreements or other records validating its possession of the Category 3 data; and

- the Category 3 data films possessed by Kerr–McGee were of arguably poor quality, thereby allowing the jury to reasonably infer they were not originals provided directly by Mark to Kerr–McGee.[5]

In our view, this circumstantial evidence was more than sufficient to have allowed the jury to reasonably infer that Kerr–McGee utilized one of the improper means listed in the district court's instructions to obtain access to the Category 3 data. Thus, we conclude the district court did not abuse its discretion in denying Kerr–McGee's Rule 59 motion for new trial with respect to the jury's findings regarding the Category 3 data.[6]

---

5. The parties argue about the quality of the Category 3 data films found to be in Kerr–McGee's possession. It is difficult to resolve this argument based solely on a reading of the trial transcript.

6. In its fourth issue on appeal, Kerr–McGee contends that if either of the jury's two misap-

propriation findings are determined to be erroneous, a new trial must be granted because the verdict form utilized by the district court failed to require the jury to make separate damage findings with regard to each act of misappropriation. Because we have concluded that neither of the jury's misappropriation

*4. Excessiveness of damages*

In its final issue on appeal, Kerr–McGee contends, for several reasons, that the jury's damage award was excessive and warrants a remittitur or a new trial. Kerr–McGee first asserted these issues in its post-trial motion, and the district court denied them on the merits. We review the district court's denial of Kerr–McGee's motion for remittitur or a new trial due to excessive damages under a highly deferential standard, reversing only if we can discern a "manifest abuse of discretion." *Vining v. Enter. Fin. Group, Inc.*, 148 F.3d 1206, 1216 (10th Cir.1998). Under this standard, the jury's award is inviolate unless we find it "so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *Id.*

Turning to Kerr–McGee's specific arguments, it first contends that 64%, or approximately 10,100 miles, of the Category 1 data "could not be at issue for misappropriation damages" because that data was covered by license agreements that, in Kerr–McGee's view, expressly allowed Oryx, as the licensee, to share the data with Kerr–McGee as a result of the two companies' merger. Aplt. Br. at 65. For the reasons already discussed above, however, we conclude that Mark presented sufficient evidence to allow the jury to reasonably find that all of the agreements covering the Category 1 data precluded Oryx from "sharing" the data with Kerr–McGee. Thus, we conclude there is no merit to this specific attack on the jury's damage award.

Kerr–McGee next challenges what it describes as the "exorbitant $25 million misappropriation damages award," *id.* at 66, arguing that (a) Mark "still retains all its

original seismic data" and thus "has not 'lost' the value of its acquisition costs for that data," *id.* at 67, (b) even if Mark could recover acquisition costs for the data, its actual acquisition costs were only $54 per mile, *id.*, (c) Mark is not entitled to license fees for all of the data because some of that data was covered by license agreements that allowed for Oryx to share the seismic data with Kerr–McGee, (d) a transfer fee of $200 per mile, rather than a $1,200 per mile license fee, "should be applied to the Category 1 data because Oryx had already paid a license fee to obtain that data," *id.* at 70, and (e) the assumption of a $1,200 per-mile license fee fails to take into account applicable volume discounts.

These arguments all fail. In its instructions to the jury regarding compensatory damages for misappropriation, the district court stated, in pertinent part:

> With respect to any award of compensatory damages for ... Mark's misappropriation of trade secrets claims, you may consider the dollar amount of lost license fees, if any, that ... Mark established to a reasonable degree of certainty. You may also consider evidence regarding the actual value, if any, of the seismic data that ... Mark alleges to have been misappropriated to the extent that value reflects something other than or different from lost license fees. There is no exact standard for setting the compensation to be awarded for these elements of damages. Rather, you should use your sound discretion in making an award of damages, drawing reasonable inferences from the facts in evidence.

App. at 903.

During its case-in-chief, Mark presented a host of evidence, including testi-

findings are subject to reversal, we conclude    this issue is moot.

mony from former Kerr–McGee employees, establishing that the going license rate for seismic data of the sort that Mark/PGI licensed to Oryx and Kerr–McGee was approximately $1,200 to $1,300 per mile. That evidence alone, in our view, justifies the jury's $25,266,381 damage award. More specifically, the jury awarded that figure in connection with its findings that Kerr–McGee misappropriated 15,745 miles of Category 1 data and 3,175 miles of Category 3 data, for a total of 18,920 misappropriated miles of seismic data. Dividing the $25,266,381 damage award by 18,920 miles equals an award of $1,338 per mile, or just slightly above the license rate per-mile established by Mark's evidence.

To be sure, Mark's witnesses testified that it was common for licensees of seismic data to receive volume discounts, and that in cases where a license agreement was being transferred from one entity to another a lower transfer fee, rather than the regular per-mile license fee, would be charged. However, in light of the jury's findings that Kerr–McGee engaged in misconduct by misappropriating Category 1 and Category 3 data, we conclude it was reasonable for the jury to choose not to afford Kerr–McGee the advantage of those volume or transfer fee discounts.

It also deserves mentioning, as the district court did in rejecting these same challenges to the jury's damage award, that Mark presented evidence establishing "that the misappropriated data had a research and development/actual asset value...." *Id.* at 837. For example, Robert Gray, the geophysicist who testified as Mark's expert in the area of custom and practice in the licensing of seismic data, testified that the developmental cost for the Category 3 data alone would have been in the billions of dollars. In light of this evidence, we conclude the jury's award of $25 million was reasonable.

To the extent that Kerr–McGee contends that some of the Category 1 data was covered by license agreements that allowed Oryx to transfer such data to Kerr–McGee via merger, the jury obviously rejected that contention and we have concluded, as outlined above, that Mark's evidence was sufficient to support the jury's finding in this regard.

Finally, Kerr–McGee asserts that the $968,750 in damages awarded in connection with the jury's breach of contract finding regarding the Category 2 data was excessive because (a) it amounts to a "$1,250–per–mile award [that] is in excess of the maximum license fee that Mark asked the jury to award ($1,200 per mile)," Aplt. Br. at 75, (b) a transfer fee, rather than a per-mile license fee, is more appropriate, and (c) Mark "did not prove any recoverable damages for any purported 'failure to return' or 'failure to safeguard' the Category 2 data," *id.* at 76. For substantially the reasons outlined above, we conclude that the evidence presented by Mark regarding its normal license fees for the seismic data, and regarding its development fees for that data, was more than sufficient to support the jury's award.

In sum, then, we conclude the district court did not abuse its discretion in denying Kerr–McGee's motion for remittitur or new trial due to excessive damages.

### *Mark's cross-appeals—Nos. 08–1047 and 08–1236*

Mark asserts four issues in its cross-appeals. In the first three of those issues, Mark contends that "[i]n the event that th[is] Court reverses the district court's judgment and the case is returned to the district court for retrial, certain of the district court's rulings require correc-

tion." [7] Aplt. Br. at 59. Because we have concluded that none of the issues asserted by Kerr–McGee in its appeal warrant reversal of the district court's judgment, we find it unnecessary to address the first three issues raised by Mark. Thus, that leaves only Mark's contention that "if the district court's judgment is affirmed, the case should be remanded with instructions to the district court to assess attorney[ ] fees against Defendants." *Id.* at 60.

On October 12, 2007, Mark moved for an award of attorney fees. In support of its motion, Mark offered two alternative arguments why it was entitled to an award of fees. First, Mark argued that the circumstances of its case brought it within a provision of Colorado's Uniform Trade Secrets Act allowing for fee awards. Second, and alternatively, Mark argued that a provision in a May 13, 1994 license agreement (the 1994 Agreement) between itself and Kerr–McGee providing that Kerr–McGee would "indemnify and hold [Mark] harmless from and against any loss to [Mark] resulting from or relating to any breach" by Kerr–McGee was sufficiently broad as to encompass an award of fees. The district court denied Mark's motion "without prejudice to its being re-filed following rulings on the Rule 59 and 50(b) motions." Aplee. App. at 58. Although Mark renewed its motion for fees (arguing the same grounds), the district court summarily rejected that motion.

Generally speaking, we review a district court's denial of a motion for attorney fees for an abuse of discretion. *Ryan v. Am. Natural Energy Corp.*, 557 F.3d 1152, 1164 (10th Cir.2009). To the extent, however, that the district court's ruling relied upon the construction of a statute, we apply a de novo standard of review. *Id.*

Turning first to the Colorado Uniform Trade Secrets Act, that Act includes the following provision regarding attorney fees:

> If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney fees to the prevailing party.

Colo.Rev.Stat. § 7–74–105. Obviously, the only portion of this statute that is remotely applicable to Mark's case is the last phrase referring to the existence of "willful and malicious misappropriation." Although Mark asserts that it produced evidence that Kerr–McGee engaged in such conduct, a review of the record on appeal establishes otherwise. More specifically, we conclude that Mark's evidence was insufficient to allow the jury to find either that Kerr–McGee's conduct was willful or malicious.

Mark's second proposed basis for a fee award is a provision in the 1994 Agreement between Kerr–McGee and Mark in which Kerr–McGee agreed to hold Mark harmless from and against any loss to Mark resulting from or relating to any breach by Kerr–McGee. Whether this provision of the 1994 Agreement encompassed attorney fees "is at bottom a question of contract interpretation, which we review de novo." *Allison v. Bank One-*

---

7. In its reply brief, Mark purports, for the first time, and contrary to the assertions in its opening brief, to seek relief in the form of a remand and new trial on its punitive damages issue even if we reject all of Kerr–McGee's arguments and affirm the district court's judgment. Kerr–McGee, in response, has moved to strike that portion of Mark's reply brief. Because the general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief, we grant Kerr–McGee's motion to strike. *See Wheeler v. Comm'r*, 521 F.3d 1289, 1291 (10th Cir.2008) ("issues raised by an appellant for the first time on appeal in a reply brief are generally deemed waived").

*Denver,* 289 F.3d 1223, 1244 (10th Cir. 2002) (italics omitted) (applying Colorado law in construing the provisions of an indemnity agreement which one party asserted encompassed attorney fees). Under Colorado law, "'attorney fees and costs should not be awarded for breach of'" a written agreement unless the "'agreement expressly provides that remedy.'" *Id.* (quoting *Bunnett v. Smallwood,* 793 P.2d 157, 162 (Colo.1990)). This rule is consistent with the Colorado courts' strict adherence "to the 'American Rule' of disallowing attorney's fees against a losing party in litigation." *Id.*

█ Contrary to Mark's assertion, the language of the 1994 Agreement does not clearly and expressly provide for an award of attorney fees to Mark in the event of a breach of the agreement by Kerr–McGee. Thus, the district court did not abuse its discretion in denying Mark's motion for fees to the extent that motion was based on the terms of the 1994 Agreement.

The judgment of the district court is AFFIRMED. Kerr–McGee's motion to strike portions of Mark's reply brief is GRANTED. Kerr–McGee's motion to include jury instructions in the appendix is GRANTED.