FILED
United States Court of Appeals
Tenth Circuit

March 7, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

THOMAS ROWE,

      Plaintiff - Appellee/
      Cross-Appellant,

v.

DPI SPECIALTY FOODS, INC.; JAMI
FLOYD,

      Defendants - Appellants/
      Cross-Appellees.

Nos. 16-4159 and 16-4168
(D.C. No. 2:13-CV-00708-DN)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **HARTZ**, and **PHILLIPS**, Circuit Judges.
_____

In this employment case, Plaintiff-Appellee Thomas Rowe brought claims of

defamation and tortious interference with economic relations. Rowe alleges his

employer, Premier Sales Solution ("Premier"), terminated his employment because food

distributor DPI Specialty Foods, Incorporated ("DPI"), through its Account Executive,

Jami Floyd (collectively, "Defendants"), made two false and defamatory statements about

_____

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

him.[1]  Rowe claims Floyd told the then-owner of Premier, Rob Kinsella, that Rowe misappropriated money Premier raised for a charity golf tournament and raffle.  Rowe also contends Floyd told Kinsella that food retailer Smith's Food and Drug Stores ("Smiths"), Rowe's only customer for the last 14 years, no longer wanted to work with Rowe.  Rowe was subsequently removed from the Smith's account and later terminated from Premier.  Thereafter, Rowe was unable to find employment in the food brokerage industry, despite having more than 30 years' experience as a food broker.

Before trial, Rowe filed three Daubert motions in limine to exclude or limit the testimony of Derk Rasmussen, Defendants' expert witness.  Rowe argued the district court should exclude: (i) Rasmussen's statements of fact and summaries of testimony, (ii) unqualified vocational and industry opinions, and (iii) improper expert opinions on mitigation of damages.  The district court granted Rowe's first two Daubert motions, and denied his third motion.  Also before trial, Defendants proposed a jury instruction allowing the jury to also allocate fault to Rowe, which the district court included over Rowe's objection.

After Rowe presented his case-in-chief, Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  The district court granted the

---

[1] Rowe alleged in the district court that Defendants made three false and defamatory statements about him.  The third statement was "that Smith's [Food and Drug Stores] refused to deal with Mr. Rowe because he refused to work on competitive products."  Aplt. App., at 1406.  The district court concluded the evidence was insufficient for a reasonable jury to find Defendants made the third alleged false and defamatory statement as a matter of law, id., and the third statement is not at issue on appeal.

motion in part, as it related to another alleged defamatory statement not at issue on appeal and to punitive damages. The court reserved ruling on the rest of the motion. The jury found for Rowe on both his defamation and intentional interference with economic relations claims. The jury found that Rowe suffered $575,000 in compensatory damages. However, the jury allocated fault between the parties, finding Defendants were 57% responsible for Rowe's injuries and Rowe was 43% responsible. This reduced Rowe's damage award to $327,750.

Following trial, Defendants filed a motion for judgment as a matter of law under Rule 50(b). The district court denied the motion. Defendants timely appeal both the district court's denial of their motions for judgment as a matter of law and the earlier grant of Rowe's Daubert motions in limine. Rowe cross-appeals the district court's jury instruction allowing fault to be allocated between him and Defendants. We exercise jurisdiction under 28 U.S.C. §§ 1291, and AFFIRM.

# I

We conclude the district court did not err in: (i) denying Defendants' motions for judgment as a matter of law, as there was sufficient evidence to support the jury's verdict in Rowe's favor; (ii) excluding portions of Rasmussen's testimony, as the testimony extended beyond the scope of his expertise and was unhelpful to the jury; and (iii) instructing the jury that it may allocate fault between Rowe and Defendants, as the Utah Supreme Court broadly held in Graves v. North Eastern Services, Inc., 345 P.3d 619 (Utah 2015) (holding fault may be allocated in intentional tort cases).

3

*A. Rule 50(a) and (b) Motions for Judgment as a Matter of Law*

We review de novo a district court's denial of Rule 50(a) and (b) motions for judgment as a matter of law applying the same standards as the district court, and drawing all reasonable inferences in Rowe's favor as the nonmovant. Elm Ridge Expl. Co., LLC v. Engle, 721 F.3d 1199, 1216 (10th Cir. 2013). Defendants "are entitled to judgment as a matter of law only if the court concludes that 'all of the evidence in the record . . . reveals no legally sufficient basis for a claim under the controlling law.'" Wagner v. Live Nation Motor Sports, Inc., 586 F.3d 1237, 1244 (10th Cir. 2009) (emphasis added) (quoting Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d 1260, 1269 (10th Cir. 2008)). "[W]e will reverse a district court's refusal to grant judgment as a matter of law only 'if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.'" M.D. Mark v. Kerr-McGee Corp., 565 F.3d 753, 761 (10th Cir. 2009) (emphasis added) (quoting Hardeman v. City of Albuquerque, 377 F.3d 1106, 1112 (10th Cir. 2004)). "It is not our province to 'weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury.'" Wagner, 586 F.3d at 1244 (quoting Hysten, 530 F.3d at 1269).

*1. Rowe's Defamation Claim*

The district court instructed the jury on the six elements of Rowe's defamation claim as follows:[2]

---

[2] The defamation and intentional interference with economic relations jury instructions are not contested on appeal. Thus, for purposes of this appeal, we assume

(Continued . . .)

In order to recover any damages for defamation, Mr. Rowe has the burden of proving, by a preponderance of the evidence, each of the following elements for each individual defamatory statement alleged by Mr. Rowe:

1. That Ms. Floyd or DPI published (in print or orally) the statement;
2. That the alleged defamatory statement complained of contained a materially false statement of fact;
3. That the materially false statement of fact was defamatory;
4. That the materially false and defamatory statement referred to Mr. Rowe;
5. That the person who allegedly made the defamatory statement did [so] with the requisite degree of fault; and
6. That the publication of the materially false and defamatory statement was the proximate cause of Mr. Rowe's alleged damages.

Mr. Rowe must prove each of these elements for each individual defamatory statement, meaning that he cannot succeed by proving that one statement was false, that another statement was defamatory, that another statement was made with the requisite degree of fault, and that another statement was the proximate cause of his alleged damages.

Aplt. App., at 752. Defendants argue Rowe did not prove any of the elements of defamation with respect to either of the alleged false and defamatory statements. We disagree.

*a. Publication and Materially False and Defamatory Statement of Fact about Rowe*

The following evidence provides a sufficient basis to establish elements one through four of defamation for both statements. First, as regards publication, the evidence is sufficient to allow a jury to find DPI made both statements to Kinsella. Second, both statements were defamatory statements of fact. Third, both statements were materially false statements of fact—Rowe did not actually misappropriate or misuse any

(cont'd)
those two jury instructions accurately reflect the elements of defamation and tortious interference with economic relations under Utah law.

5

funds in connection with the tournament,[3] and there was no evidence Smith's did not want to work with Rowe and wanted him removed from its account.[4]  Finally, the statements referenced Rowe.  We reject Defendants' attempts to isolate evidence, ignore evidence favorable to Rowe, and challenge the weight of evidence or credibility of witnesses.  See Wagner, 586 F.3d at 1244 ("It is not our province to 'weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury.'" (quoting Hysten, 530 F.3d at 1269)).

### i. Evidence of Statement 1—That Rowe Misappropriated Charity Funds

Defendants argue Floyd "testified that she never accused Mr. Rowe of misappropriating money or words of similar effect, and Mr. Rowe failed to produce any evidence at trial to the contrary."  Aplt. Op. Br., at 30 (emphasis added).  However, as the district court noted, Floyd's testimony raises "a question of credibility which was appropriately resolved by the jury."  Aplt. App., at 1391.  Moreover, Rowe did produce

---

[3] See Aplt. App., at 1027 ("Q: It was literally impossible for you to misappropriate money that had been raised because none of it had ever touched your hands; true?  A: Correct.").

[4] Defendants also appear to argue "truth" as a defense to defamation.  See Aplt. Reply Br., at 16.  Here, Defendants point to Floyd's testimony that "DPI let Premier know that the customer would rather work with Rick Hansen," Aplt. App., at 1232, which was true, as Shellie Hanson stated she preferred working with Rick Hansen, id. at 2110.  Defendants argue Kinsella testified he removed Rowe from the Smith's account because Rick Hansen was a better fit for Smith's, which was also true.  Id. at 633.  However, Defendants pick and choose evidence favorable to them, while ignoring evidence tending to show Floyd made the false statement that Smith's did not want to work with Rowe, which is different than the statement that Smith's preferred Rick Hansen.  In fact, Shellie Hanson and Day testified that neither of them said they did not want to work with Rowe.

6

evidence to the contrary, and Rowe's evidence was sufficient to establish that Floyd stated to Kinsella that Rowe misappropriated funds in connection with the Smith's charity golf tournament.

First, Floyd testified that, prior to September 2012, she had never spoken with Kinsella. Yet, upon her return from a trip to Spain, when she saw Rowe's suggestion to eliminate cheeses from the Smith's cheese island, Floyd emailed Kinsella stating, "I would like to discuss this with you tomorrow along with a few other things." Id. at 1667, 1175. Following their discussion, Kinsella allegedly spoke with Mark Miale, Vice President of Business Development at Premier and Rowe's supervisor, about Rowe's conduct at the tournament, questioning whether Miale had any information related to expenses. Miale also stated he "th[ought] it came from DPI to Rob [Kinsella], that maybe monies that were used for th[e golf tournament] weren't allocated as they should have been."[5] See id. at 656, 1392–93.

Thereafter, Miale allegedly told Rowe that Rowe was being accused of misconduct related to the tournament. Rowe then emailed Shellie Hanson, Smith's deli

---

[5] Defendants also argue the district court erred by denying their hearsay objection to Miale's testimony. Aplt. Op. Br., at 33. We "will set aside a jury verdict only if [an] error prejudicially affects a substantial right of a party." Minshall v. McGraw Hill Broadcasting Co., Inc., 323 F.3d 1273, 1283 (10th Cir. 2003) (citation omitted). Miale's testimony was not the sole evidence of the first statement. Other evidence, including Rowe's admissible email communications, demonstrated the evidence that Miale's testimony also established—that Rowe was accused of misappropriating funds at the tournament. Thus, even without the challenged statement, there would still be substantial evidence to support the verdict.

and bakery director, stating Floyd "accused [him] of misappropriation of funds at the golf tournament to" Kinsella. Id. at 1606. Rowe sent another email on this topic to Miale:

> [B]ecause you mentioned it was brought up, I have attached my credit card statement showing the charges at the Smith's golf tournament. Maybe Jami [Floyd] is assuming I purchased silent auction items with the funds, but as you can see, I paid $5500 on my card for what I purchased in the silent auction. The other charges are the raffle tickets which I expensed.

Aple. Supp. App., Vol. I, at 82 (emphasis added). Rowe sent additional emails explaining his conduct at the tournament, providing an accounting of his expenses, and attaching his credit card statement.

Other witnesses also testified Floyd stated Rowe misappropriated or misused funds at the tournament. For example, Angie Hayes, who worked for Premier under Rowe, testified Floyd told her "[t]hat [there] was [a] misappropriation of funds" by Rowe at the tournament. Id. at 2372. Hayes also testified she was told (but she did not say by whom) that Rowe was removed from the Smith's account because of a "misappropriation of funds." Id. As the district court concluded, "Hayes's trial testimony reveals that she had a conversation with Ms. Floyd regarding the accusation made about Mr. Rowe's use of funds and Ms. Floyd used the term 'misappropriation of funds.'" Aplt. App., at 1397.

Zane Day, Vice President of Sales and Merchandising at Smith's, testified at trial that Floyd told him "there was concern that there was [sic] some issues of company funds" involving Rowe. Id. at 1291–94, 2031–32. At his deposition, Day testified Floyd used the term "misappropriation" to describe her concern about the tournament raffle. Id. When Day was impeached at trial with his deposition testimony, Day stated, "I'm not sure if the words are the same . . . . [I]t was either misuse or misappropriation of funds.

8

I'm not exactly sure which one it was." Id. As the district court noted, "Day's trial testimony reveals that he had a conversation with Ms. Floyd, the Smith's charity golf tournament was a topic of conversation during the call, Ms. Floyd discussed concerns regarding issues of company funds involving Mr. Rowe . . . , and Ms. Floyd used the word misappropriation or misuse during the phone conversation."[6] Id. at 1394–95. The district court concluded Miale's testimony, coupled with Hayes's and Day's testimony, "provides sufficient circumstantial evidence upon which a jury could reasonably infer that" Floyd made the alleged defamatory statement. Id. at 1393.

But there was even more evidence supporting the factual finding that Floyd made the first statement. Patricia Methner, Rowe's subordinate, testified that she heard Rowe was terminated because of a "misappropriation of funds" (along with Smith's not wanting Rowe on its account). Id. at 1255–56. Finally, Tim Smith, who worked for DPI's specialty cheeses division, testified Floyd told him Rowe "had pocketed a number of drink tickets at the [charity] event and that he had gotten or won several prizes in a raffle that had a suspicious nature" because "it was more than you could win by the odds." Id. at 1283.

---

[6] Defendants argue that, although both Hayes and Day testified they heard Floyd say "misappropriate," it is unclear what Floyd said to Hayes and Day, as counsel did not present a follow-up question to clarify what Floyd said about "misappropriation," and neither witness testified Floyd stated Rowe misappropriated money. Aplt. Op. Br., at 35–36. Defendants emphasize a statement can contain the word "misappropriation" and not be a false or defamatory statement. See id. These are arguments Defendants' counsel should have made—and did make—to the jury at trial, and whether Hayes and Day's testimony was clear and reliable was a determination for the jury.

*ii. Evidence of Statement 2—That Smith's Did Not Want to Work with Rowe*

Rowe also presented sufficient evidence that Floyd stated Smith's no longer wanted to work with him.

Less than a month before Kinsella removed Rowe from the Smith's account, Kinsella emailed Rowe offering to buy him the best steak in Texas, take him to any Cowboy football game he desired, and promising lifetime employment with Premier. On September 26, 2012, while Rowe was recovering at home from back surgery, Floyd emailed Kinsella asking to meet with him and Russ Blake, President of DPI's Intermountain West Division, to discuss Rowe, and stating she wanted to exclude Smith's from the conversation. Two days later, Blake emailed Floyd asking whether they need to "talk about Smith[']s." Aple. Supp. App., Vol. II, at 326. Less than an hour later, Kinsella emailed Blake, copying Miale and Floyd, stating that Kinsella and Miale informed Rowe that "starting immediately," he "will have no involvement with DPI at Smith's." Id. Vol. I, at 89. Kinsella continued, stating, Rowe's "responsibilities will be transferred to Rick Hansen[, another Premier broker,] effective today. We are very confident that Rick can provide DPI the representation that they are looking for at Smith's to move the business forward." Id. (emphasis added).

Notably, the email states Hansen will provide DPI the representation it was looking for, and did not refer to any change Smith's had requested. Also, no representative from Smith's was copied on the email. Had Smith's requested Rowe's removal from its account, it would make sense for Kinsella to inform Smith's that he had

10

honored its request. Instead, Kinsella only sent the email to two DPI representatives—Floyd and Blake. In response, Blake did not seek an explanation for Kinsella's decision; Blake simply wrote, "[t]hank you[.]"[7] Id.

These email communications provide a reasonable basis for the jury to infer either Floyd or Blake from DPI spoke with Kinsella about Rowe's continued involvement with the Smith's account and informed Kinsella that Smith's no longer wanted to work with Rowe. But there is further evidence that DPI made the second statement.

For example, Floyd's deposition testimony was presented at trial:

Q: Besides Rick Hansen, did DPI tell anybody at Premier that Smith's no longer wanted to work with Tom Rowe?

* * *

A: Rob Kinsella was also aware of that.

Q: And who told him that?

A: I don't recall if it was Russ [Blake] or myself at this time.

Aplt. App., at 712.[8] Floyd further testified:

---

[7] Though at trial Blake denied speaking with Kinsella around the time Kinsella removed Rowe from the Smith's account, Aplt. App., at 2252–53, other evidence, including Kinsella's emails, contradicted his testimony. See, e.g., Aple. Supp., Vol. I., at 84 ("Me and Russ did touch base yesterday and plan to do so today."). Thus, the jury had sufficient evidence from which to conclude Blake or Floyd spoke with Kinsella before Kinsella removed Rowe from the Smith's account.

[8] Defendants contend that, in the preceding lines of the deposition, Floyd testified she discussed with Rick Hansen Shellie Hanson's desire for more control over her business and preference of working with Rick Hansen. Aplt. Op. Br., at 41. Immediately following this testimony, Defendants argue, Floyd "was asked besides Rick Hansen, did DPI tell anyone else at Premier that Smith's no longer wanted to work with Mr. Rowe,"

(Continued . . .)

11

Q: Did you ever tell anyone with Premier that Smith's no longer wanted to work with Tom Rowe?

\* \* \*

A: Mm-hmm.  Yes.  And I believe that I've already answered that.

Id. at 1229–30.

Methner's testimony likewise supports the finding that Floyd made the second

statement:

Q: So then you mentioned that you heard . . . that [Rowe] was not around for the president's walk because Smith's didn't want him.  I want to ask you who you heard that from.

A: Jami [Floyd].

Q: And when did she tell you that?

A: During the president's walk.  Before Tom [Rowe] was even back from his medical leave from having surgery on his back.

\* \* \*

(cont'd)
to which Floyd responded, "Rob Kinsella was also aware of that."  Id.  Defendants
contend that "[i]n this context, the statement reflects that Rob Kinsella was also aware of
what she discussed with Rick Hansen."  Id.
    The district court concluded, "it is not entirely clear . . . whether Ms. Floyd was
referring to her communications with Mr. Hansen or whether she was answering the
question of who informed Mr. Kinsella" that "Smith's no longer wanted to work with
Tom Rowe."  Aplt. App., at 1400.  We agree.  Defendants' reading of Floyd's testimony
is plausible, but so is the conclusion that Floyd testified either she or Blake told Kinsella
that Smith's no longer wanted to work with Rowe.  Floyd's deposition testimony does
not point in only one direction.  It was Defendants' prerogative to so argue to the jury
(and they did), and for the jury to determine whether to believe Floyd's earlier
testimony—that she did not tell anyone at Premier that Smith's no longer wanted to work
with Rowe—or this portion of her testimony, indicating that either she or Blake informed
Kinsella.  The jury apparently found the latter more credible.

12

Q: Okay. Tell me exactly what you heard Ms. Floyd say about that.

A: She just repeated that basically stating that she was just doing what the customer requested of her and [it] was nothing personal. It was that she had to do what her customer asked her to do, and her customer didn't want Tom [Rowe] in the account anymore.

Id. at 2941.

Moreover, there was no strong evidence that Smith's wanted Rowe removed from its account. Kinsella testified that he and Miale "mutually" decided to remove Rowe from the Smith's account, following a phone conversation they had with Shellie Hanson, Day, and Smith's Human Resources Department. However, Kinsella's testimony was refuted by other testimony at trial. For example, Miale testified Kinsella directed that Rowe "would not be involved with the DPI business at Smith's." Id. at 659. Moreover, Day testified he could not recall having a conversation with Kinsella "in the weeks or days leading up to [Rowe's] removal." Id. at 2037–38.

Nor was there any evidence from a Smith's representative that Smith's told Premier to remove Rowe from its account. In fact, Smith's employees—Day and Hanson—both denied ever making this request of Premier. As the district court concluded, "Mr. Day's and Ms. Hanson's testimony denying that they, or to their knowledge anyone else from Smith's, made such a request provide a reasonable basis for a jury to weigh the credibility of the testimony and conclude that the statement came from Defendants." Id. at 1403.

13

*b. Defendants' Requisite Degree of Fault*

The district court concluded a qualified privilege applies to Defendants' alleged defamatory statements. Therefore, to prevail on his defamation claim, Rowe was required to show Defendants made the two statements (i) knowing the statements were false, or (ii) in reckless disregard as to their truth or falsity, or (iii) with malice. Rowe presented sufficient evidence to support a conclusion that Defendants were not entitled to a qualified privilege.

We agree with the district court's conclusion that "Rowe presented sufficient evidence from which a jury could reasonably infer that Defendants made the defamatory statements with knowledge of their falsity or with reckless disregard for the truth." Aplt. App., at 1407. "[R]eckless disregard as to the falsity of [a] statement that a defendant honestly believed to be true is determined by a subjective inquiry as to the defendant's belief and an objective inquiry as [to] the inherent improbability of or obvious doubt created by the facts." Ferguson v. Williams & Hunt, Inc., 221 P.3d 205, 215 (Utah 2009).

Regarding the first statement—that Rowe misappropriated funds at the tournament—Defendants argue Rowe did not present "evidence to demonstrate Ms. Floyd did not subjectively express legitimate concerns about Mr. Rowe's behavior" at the tournament because Rowe failed to take care of his customer (Smith's). Aplt. Op. Br., at 46–47. However, Defendants argued to the jury that because Rowe did not handle money in connection with the tournament, Rowe's allegation that Floyd stated he misappropriated money was illogical. See Aplt. App., at 1027. Defendants' own

14

argument, as the district court concluded, was a basis "from which the jury could have reasonably inferred knowledge of the falsity of the statement." Id. at 1408. The fact that Rowe could not have misappropriated funds at the tournament supports a finding that the statement was objectively false.

Regarding the second statement—that Smith's did not want to work with Rowe anymore—Defendants argue that, even if Floyd made the statement, Floyd's knowledge of Shellie Hanson's preference to work with Rick Hansen or with Hayes over Rowe demonstrates Floyd subjectively believed her statement was "an accurate summary of the state of the relationship between Smith's and Tom Rowe." Aplt. Reply Br., at 21. However, Floyd's email to Kinsella indicating it would be prudent to leave Smith's out of their conversations about Rowe indicates otherwise.

Defendants further argue that the statement that Smith's no longer wanted to work with Rowe "is not inherently improbable under an objective inquiry," pointing to Shellie Hanson's testimony that she was not surprised when Rowe was removed from Smith's account. Id. However, Rowe presented evidence of the second statement's inherent improbability, including testimony from Smith's representatives—Hanson and Day—that neither they, nor, to their knowledge, anyone else at Smith's, affirmatively requested Rowe's removal from the Smith's account. Moreover, Floyd's email to Kinsella noting she "would feel more comfortable . . . not involving" Smith's in their discussions about Rowe, Aplt. App., at 489, and Kinsella's announcing Rowe's removal from the Smith's account only to DPI representatives and not to any of Smith's representatives, both

15

support an inference that Defendants made the second statement with reckless disregard as to its falsity.[9]

### c. Causation

Defendants contend there is no evidence Kinsella considered the first statement in removing Rowe from the Smith's account or in terminating him. In so arguing, Defendants overlook Miale's testimony indicating Kinsella had spoken with Miale and that Kinsella relayed to Miale information about a misallocation of monies, questioning Miale on this topic. Moreover, Rowe, Day, Methner, and Hayes all stated they heard Rowe was removed from the Smith's account because of a misuse of funds.

Defendants further argue Kinsella did not testify he considered the second statement when he removed Rowe from the Smith's account and later terminated him, which indicates Rowe was let go due to "behavioral issues," as stated in his termination

---

[9] Rowe can also meet the state of mind requirement by showing malice; that is, "an improper motive of spite or ill will." See Ferguson, 221 P.3d at 212 n.1. As to malice, Rowe painted a picture for the jury of Floyd's purported personal vendetta against him. See Aple. Resp. Br., at 45–48 (including, for example, Floyd's "complete disagreement" with Rowe's suggestion to remove certain cheeses from the Smith's cheese island; Floyd's insistence that Hayes, not Rowe, attend a Smith's event in Las Vegas; Floyd scheduling meetings with representatives from Smith's, excluding Rowe; Floyd "taking over" a "Four Cheese Promotion," which was Rowe's province; and Floyd "ignoring" Rowe at work events). Rowe also cites Floyd's initiation of a discussion with Smith's about extra brokerage fees paid to Rowe, as well as Floyd's "digging up" of old emails (from about 5 years prior) between Rowe and Mitch Alm, Smith's Deli Director at the relevant time, showing Alm's request of favors from Rowe and Rowe's intent to fulfill Alm's requests, id. at 49. Rowe finally contends Floyd's timing contributes to the conclusion that her acts were motivated by ill will, as Floyd's discussions about the double brokerage fee, Floyd's forwarding of the emails from 2006 and 2007, and Floyd's talk with Kinsella all took place while Rowe was out-of-work recovering from surgery. This evidence, too, is sufficient to demonstrate an abuse of privilege.

16

letter. However, Kinsella sent emails to Rowe—less than a month before removing Rowe from the Smith's account—stating Rowe would be at Premier "for a lifetime." While Rowe's termination letter noted "behavioral issues" as the reason for his termination, those issues existed when Kinsella praised Rowe via email and offered him the best steaks in Texas as a reward for his work. Further, when Kinsella was questioned about the reason for Rowe's termination, Kinsella did not cite "behavioral issues," but instead stated, "there was really little for [Rowe] to do at that point. He couldn't call on the customer." Id. at 639. In fact, when Kinsella was asked whether he took Rowe off the Smith's account because of "contact with women," Kinsella testified, "[n]ot that I'm aware of." Id. at 1274–75. Thus, the jury had sufficient evidence to conclude Kinsella removed Rowe from the Smith's account and terminated him from Premier because of Floyd's statements, rather than "behavioral issues."

### 2. Rowe's Intentional Interference Claim

The jury determined Defendants were also liable under Rowe's intentional interference with economic relations claim. The elements of Rowe's intentional interference with economic relations claim were presented to the jury as follows:

> To prevail on his claim, Mr. Rowe has the burden of proving, by a preponderance of the evidence, each of the following elements:
> 1. That Ms. Floyd and DPI intentionally interfered with Rowe's existing economic relations with Premier Sales Solutions;
> 2. That Ms. Floyd and DPI used improper means by making certain statements to interfere with his existing economic relations;
> 3. That Ms. Floyd and DPI acted with the requisite degree of fault; and
> 4. That Ms. Floyd and DPI thereby caused economic injury to Mr. Rowe.

17

> The defendants, Ms. Floyd and DPI, deny Mr. Rowe's allegations. The defendants also allege three affirmative defenses: that the alleged statements were true, and that Mr. Rowe is at least partially at fault for his damages, and that Mr. Rowe failed to mitigate his damages.
>
> The plaintiff, Mr. Rowe, denies the allegations of Ms. Floyd and DPI.

Id. at 759.

Because there is sufficient evidence of Rowe's first claim for defamation, Rowe also satisfied the elements of tortious interference, having shown an improper means.[10]

Defendants chiefly point to evidence favorable to their position and attempt to discredit evidence favorable to Rowe. However, "we will reverse a district court's refusal to grant judgment as a matter of law only 'if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.'" Kerr-McGee, 565 F.3d at 761 (emphasis added) (quoting Hardeman, 377 F.3d at 1112). Defendants fail to meet this heavy burden. The totality of the evidence provides a sufficient basis for the jury's verdict.

---

[10] Before Eldridge v. Johndrow, Utah courts allowed a plaintiff to prove tortious interference without an improper means, so long as the defendants harbored a predominantly improper purpose. See 345 P.3d 553, 563–65 (Utah 2015); Anderson Dev. Co. v. Tobias, 116 P.3d 323, 331 (Utah 2005) ("[O]nly one alternative, either improper purpose or improper means, need be established; a plaintiff need not prove both."). Eldridge changed the law by requiring an improper means to establish a claim for tortious interference. See 345 P.3d at 565 ("We therefore conclude that the improper-purpose doctrine has not worked well in practice, . . . . It should therefore be abandoned."); id. at 555 ("[N]o tortious interference claim can succeed without evidence of improper means.") (citation omitted). And, defamation is "[c]ommonly included among improper means." Leigh Furniture & Carpet Co. v. Isom, 657 P.2d 293, 308 (Utah 1982) (quotation omitted).

18

*B. Exclusion of Portions of Defendants' Expert Witness's Testimony*

Defendants also argue the district court erred in excluding parts of the testimony of their expert witness, Derk Rasmussen. We disagree. We "review for abuse of discretion the trial court's actual application of the gatekeeper standard in deciding whether to admit or exclude an expert's testimony." Goebel v. Denver & Rio Grande W. R. Co., 346 F.3d 987, 990 (10th Cir. 2003). "[W]e will not disturb the district court's ruling unless it is 'arbitrary, capricious, whimsical or manifestly unreasonable' or when we are convinced that the district court 'made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" Id. (quoting Dodge v. Cotter Corp., 328 F.3d 1212, 1223 (10th Cir. 2003)).

First, Rasmussen improperly sought to testify and opine on matters outside of his expertise and within the province of the jury. Rasmussen is an economics and damages expert. Yet, Rasmussen desired to offer vocational opinions.[11] See Aplt. App., at 111 ("[F]ood brokers must rely heavily on their networking for job opportunities but to maximize their opportunities they must supplement this with membership in specialized networking organizations such as FoodBrokersUSA and involvement with professional recruiting organizations. In Mr. Rowe's case, I cannot find any indication he has reached

_____

[11] Defendants argue Jeremy Sharpe, Rowe's expert witness, "was permitted to assume various issues that are typically reserved for vocational experts," such as that Rowe's "current employment is his highest level of attainable employment and that he is unable to find a job in his field due to defamatory rumors." Aplt. Reply Br., at 33 (emphasis added). However, making assumptions based on facts in evidence, and asserting assumptions as uncontroverted facts or as expert opinions to the jury, are two different things. The district court properly disallowed Rasmussen from engaging in the latter.

19

out to either of these types of organizations in his job search."); id. at 119 ("[A] minimal level of effort was taken in each [job] application by submitting mass applications with just a resume attached . . . . [T]hese mass applications exclude a cover letter, while the option is clearly available, which would have given the application the individual attention employers often look for."); id. at 122 ("Market realities, unprofessional and inappropriate working relationships and behavior, an uncompetitive resume, and lackluster networking and job searching all have contributed to [Rowe's] current circumstances."). However, Rasmussen was not qualified either by knowledge, skill, or expertise to opine on Rowe's job qualifications, job search efforts, or job prospects.[12]

Nor did Rasmussen understand his role in the courtroom, seeking, as the district court noted, "to opine on the weight of the facts," and to "take a principal role in sifting, weighing and reciting them for the jury." Id. at 274. For example, Rasmussen concluded that "based on Mr. Rowe's own testimony, the termination letter issued by Premier, and [Rasmussen's] analysis of the available facts, a pattern of inappropriate behavior and management restructuring at Smith's appear to be causes of the termination of [Rowe's] employment." Id. at 111. Rasmussen supported his conclusion by asserting as true that: (i) "Rowe exhibited a pattern of inappropriate behavior in his dealings with various female coworkers, including, importantly, his contacts at Smith's," id. at 112; (ii) "Rowe's style might have worked with his old contacts at Smith's, but it appears it

---

[12] Contrary to Defendants' argument, the fact that Rasmussen "reviewed agency data and researched occupational data for specialized recruiters in the food industry, which informed" his opinions, Aplt. Reply Br., at 33, is insufficient to render him a vocational expert qualified to testify to these matters.

20

was unacceptable to the new management," id. at 117; and (iii) Mitch Alm, Smith's Deli Director at the relevant time, "was no longer working in direct contact with Mr. Rowe," and "[l]osing his major contact at Smith's affected Mr. Rowe's value as a broker dramatically," id. at 127. But these facts were contested and were for the jury to ultimately decide. As Rowe argues, Rasmussen "viewed each of his assertions as core expert opinions on which he was competent to testify." Aple. Resp. Br., at 58; see, e.g., Aplt. App., at 153 ("Q: And, in assessing economic causation, this part that you have testified that's within your province, does that, then, provide you license to weigh and compare facts and reliability of witnesses in arriving at your opinions as to what caused what? A: From an economic point of view, yes."). Thus, the district court did not abuse its discretion in excluding Rasmussen's unreliable and unhelpful testimony.[13]

## C. Fault Allocation Instruction – Rowe's Cross Appeal

Rowe contends the district court erred in instructing the jury that it may allocate fault between him and Defendants, arguing that fault cannot be allocated to a plaintiff who is seeking damages for intentional torts. We "review a district court's decision to give a particular jury instruction for abuse of discretion; ultimately, however, we apply a

_____

[13] Defendants' attempt to analogize the district court's exclusion of Rasmussen's testimony to that in Eskelson ex rel. Eskelson v. Davis Hospital and Medical Center is unpersuasive. 242 P.3d 762 (Utah 2010). In Eskelson, "[t]he district court suggested that because [a party's expert witness] relied more heavily on the testimony of certain witnesses, he was thereby expressing an opinion as to the truthfulness of those witnesses." 242 P.3d at 767. The Utah Supreme Court held that "[a]n expert's decision to rely on the testimony of a particular witness does not constitute the expression of an opinion as to the credibility of that witness." Id. Here, however, Rasmussen did not simply rely on the testimony of certain witnesses over others. Rasmussen sought to testify to the reliability of certain evidence and testimony.

de novo standard of review to determine the propriety of an individual jury instruction to which objection was made at [the] time of trial." Osteguin v. S. Pac. Transp. Co., 144 F.3d 1293, 1295 (10th Cir. 1998) (citation omitted).  We conclude the district court did not err in including the fault allocation instruction over Rowe's objection.

The Liability Reform Act governs fault allocation in Utah.  The statute provides:

The fact finder may, and when requested by a party shall, allocate the percentage or proportion of fault attributable to each person seeking recovery, to each defendant, to any person immune from suit, and to any other person identified under Subsection 78B-5-821(4) for whom there is a factual and legal basis to allocate fault.

Utah Code Ann. § 78B-5-818(4)(a).  Further, the statutes states:

The trial court may, and when requested by any party shall, direct the jury, if any, to find separate special verdicts determining the total amount of damages sustained and the percentage or proportion of fault attributable to each person seeking recovery, to each defendant, to any person immune from suit, and to any other person identified under Subsection 78B-5-821(4) for whom there is a factual and legal basis to allocate fault.

Id. § 78B-5-819(1).  Under the Act, "fault" is defined as:

[A]ny actionable breach of legal duty, act, or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery, including negligence in all its degrees, comparative negligence, assumption of risk, strict liability, breach of express or implied warranty of a product, products liability, and misuse, modification, or abuse of a product.

Id. § 78B-5-817(2).

Defendants contend the definition of "fault" is "expansive," encompassing "any act or omission," and thus allows allocation of fault to Rowe, citing Graves.  See Aplt. Resp. Br., at 38.  Rowe urges that the word "actionable" in the Act "modifies each of the

22

three items that follow it—'breach of legal duty, act, or omission.'" Aple. Reply Br., at 4.

How Rowe or this court may read the Liability Reform Act is of no consequence, as the Utah Supreme Court has already interpreted the Act. The Utah Supreme Court did not hold as Rowe urges, and we must rely on and follow that court's rulings. In Graves, Defendants North Eastern Services-Lakeside, Inc. and North Eastern Services, Inc. ("NES") provided services for individuals with physical and mental disabilities. 345 P.3d at 622. Nearby children were allowed to enter NES premises and interact with NES residents based on the idea that these interactions may benefit NES residents. Id. A.R., a child who was playing on NES premises was sexually assaulted by an NES employee. Id. A.R.'s parents sued NES and the NES employee. Id. at 623. NES sought to apportion fault to the employee that sexually assaulted A.R., which the Utah Supreme Court in Graves allowed. Id. In interpreting the Liability Reform Act, the court broadly held "that the statutory principle of apportionment for 'fault' extends to cases involving intentional torts." Id. at 636.

In concluding the Act "encompass[es] intentionally tortious activity," the court in Graves construed the Act's language, stating "apportionment is called for under the statute not just for breaches of duty but for any *act* or *omission* that proximately causes or contributes to injury or damages." Id. at 629 (emphasis in original and emphasis added). The court did not modify "act" or "omission" with "actionable," noting, "the statutory definition of fault is written in terms encompassing *any* act proximately causing injury." Id. at 630 (emphasis in original). In fact the court stated, "the key limiting term of the

23

definition is the element of causation.  *Any* breach of duty, act, or omission counts as fault so long as it is proximately connected to injury or damages."  Id. at 629 (emphasis in original and emphasis added).

Rowe attempts to distinguish Graves, which allowed a negligent defendant to allocate fault to a third-party intentional tortfeasor, by arguing that, in this case, it does not make "sense to say that the victim of defamation is complicit in the defamatory acts." Aple. Reply Br., at 1.  But the correct approach is not that Rowe must share the blame for Defendants' alleged defamation and intentional interference with economic relations; rather, Rowe should share the blame for his damages—his removal from the Smith's account and subsequent termination—if his own actions contributed to his damages.

Rowe's argument is narrow, while the statute is broad.  The statute does not require that the parties among whom fault is to be allocated engage in the same wrongful act—such as, for example, defamation—but rather, they must both have engaged in a wrongful act, according to Graves, contributing to the damages.  See 345 P.3d at 629. Thus, the fact that "the supposed wrongs for which fault could conceivably be allocated to Mr. Rowe have absolutely no nexus to the intentionally tortious acts committed by Defendants," Aple. Resp. Br., at 63 n.27, is irrelevant.  So long as Rowe committed a wrongful act, and so long as the wrongful act contributed to his damages, the wrongful act need not be related to Defendants' defamatory statements to allocate fault between Rowe and Defendants.

Rowe essentially argues we should conclude the Utah Supreme Court did not mean what it said in Graves.  But it is not our role to counter or ignore a state supreme

24

court's interpretation of its own state's statutes. The Utah Supreme Court had the opportunity to interpret, and did, in fact, extensively analyze the Liability Reform Act.[14] Notably, however, the jury heard evidence of Rowe's own wrongful conduct and had a reasonable basis for concluding it was a concurrent reason for Rowe's termination from Premier.[15]

---

[14] For this reason, we also decline to certify Rowe's proposed questions to the Utah Supreme Court. The Utah Supreme Court in Graves analyzed amendments to the Liability Reform Act, acknowledged counterarguments to its conclusion allowing fault to be allocated in intentional tort cases, contextualized the statute based on legislative history, assessed previous Utah Supreme Court case law, and discussed public policy nuances. 345 P.3d at 628–38. In doing so, the Utah Supreme Court broadly concluded Utah's "statutory comparative liability regime . . . call[s] for apportionment of responsibility for intentional torts." Id. at 629. The Utah Supreme Court did not limit its holding to apportionment of responsibility among intentional tortfeasors, excluding liability for the victim of an intentional tort, though it could have. See id. at 628. Thus, whether to apportion fault in this case—one for two intentional torts—is not a novel and unaddressed question of state law. See Kansas Judicial Review v. Stout, 519 F.3d 1107, 1120 (10th Cir. 2008).

[15] The evidence includes allegations of sexual harassment, bullying behavior, and excessive drinking.

25

## II

We therefore AFFIRM the district court's (i) denial of Defendants' motions for judgment as a matter of law, (ii) grant of Rowe's motions in limine, and (iii) grant of Defendants' request for a jury instruction regarding fault allocation. We also DENY Rowe's motion to certify questions of state law to the Utah Supreme Court.

Entered for the Court


Mary Beck Briscoe
Circuit Judge